[L.A. No. 29693. In Bank. Mar. 24, 1970.]

GENOVEVA CASTRO et al., Plaintiffs-Petitioners and Appellants, v. STATE OF CALIFORNIA et al., Defendants and Respondents.

## COUNSEL

Don B. Kates, Jr., James D. Lorenz, Jr., Gary Bellow, Carol Ruth Silver, Diane Delevett, Chaparro, Perez & Buckley, A. L. Wirin, Fred Okrand and Laurence Sperber for Plaintiffs-Petitioners and Appellants.

Gerald L. Rosen as Amicus Curiae on behalf of Plaintiffs-Petitioners and Appellants.

Thomas C. Lynch, Attorney General, Charles A. Barrett, Assistant Attorney General, Sanford N. Gruskin, Deputy Attorney General, John D. Maharg, County Counsel, and Edward H. Gaylord, Assistant County Counsel, for Defendants and Respondents.

## OPINION

**SULLIVAN, J.**—In this case we are called upon to determine whether that portion of article II, section 1 of the California Constitution which conditions the right to vote upon an ability to read the English language is constitutional as applied to persons who, in all other respects qualified to vote, are literate in Spanish but not in English. As we explain, *infra,* we have concluded that the challenged provision, as so applied, violates the equal protection clause of the Fourteenth Amendment and is, therefore, a constitutionally impermissible exercise of the state's power to regulate the franchise.

Insofar as is here relevant, article II, section 1 provides ". . . no person who shall not be able to read the Constitution in the English language and write his or her name, shall ever exercise the privileges of an elector in this State; . . ." Various sections of the California Election Code implement the constitutional exclusion. Section 100 limits eligibility to vote to those persons who qualify "under the provisions of Section 1 of Article II of the Constitution of this State and who [comply] with the provisions of this code governing the registration of electors. . . ." Section 200 requires each prospective voter to complete, in the presence of a county clerk, an affidavit

of registration as a precondition to inclusion in the register of voters, and section 310 prescribes that the affidavit set forth, inter alia, "Whether the elector is able to read the Constitution in the English language and to write his name, . . ." (Elec. Code, § 310, subd. (h).)[1]

Plaintiffs-petitioners (petitioners)[2] are adult, native born United States citizens residing in Los Angeles County. Both are fully qualified to vote except for their inability to read English and both were denied registration on this basis alone.[3] Defendant-respondent (respondent) Frank M. Jordan is the Secretary of State of respondent State of California and is charged specifically with the enforcement of its electoral laws, including article II, section 1 of the Constitution and the Election Code sections just referred to. Respondent Ben Hite is the Registrar of Voters and County Clerk of Los Angeles County and is charged with the supervision of the registration

[1]The California Constitution also requires that a voter be a citizen of the United States, at least 21 years of age and a resident of California for at least one year, of the county in which he claims his vote for at least 90 days, and of the election precinct at least 54 days. (See Cal. Const., art. II, § 1.) Petitioners meet these citizenship, age, and residency requirements and do not challenge them.

[2]A "Complaint for Declaratory Judgment and Petition for Alternative and Peremptory Writs of Mandate" was filed in the court below on September 13, 1967, by Genoveva Castro and Jesus E. Parra, "Plaintiffs-Petitioners" against State of California, Frank M. Jordan as Secretary of State, State of California, and Ben Hite as Registrar of Voters and County Clerk, County of Los Angeles "Defendants-Respondents." On the same day, an alternative writ of mandate issued, directed to all respondents. Strictly speaking, the record discloses no return filed to the alternative writ either by answer or demurrer. But the record does show that all "defendants-respondents" filed an answer to the *complaint*. The cause appears to have proceeded to trial on the above pleadings, the parties being referred to throughout by their respective dual designations. The court below made no attempt to isolate the proceeding as one exclusively a civil action for declaratory relief (see Code Civ. Proc., pt. 2, §§ 1060-1062) with issues framed by a complaint and answer, or as one exclusively a special proceeding of a civil nature for a writ of mandate (see Code Civ. Proc., pt. 3, §§ 1084-1097) with issues framed by a petition (§ 1086) and answer (§ 1089). Indeed the answer filed although directed to the complaint appears to have served the double purpose of a response to the initial pleading howsoever regarded. (See 3 Witkin, Cal. Procedure (1954) pp. 2555-2556.) The trial court thus seems to have fused both forms of civil proceeding into one with dual aspects and to have carefully preserved this integration in the findings of fact and conclusions of law, and in the judgment, designating the parties throughout by their dual titles. To be consistent we will do the same, although for the sake of brevity we will refer to "plaintiffs-petitioners" as "petitioners" and to "defendants-respondents" as "respondents."

[3]It was stipulated that both petitioners are able to read an accurate Spanish translation of the California Constitution and to write their names. For purposes of this case, they may thus be considered literate in Spanish. "Literacy," as generally defined, requires both the ability to read and the ability to write a language. (Webster's Second New Internat. Dict.) Article II, section 1, however, requires merely an ability to read and to write one's name. Thus when we refer, *infra*, to "literacy" or to the constitutional provision as an "English literacy requirement" we use the term in the narrower sense consistent with the Constitution's actual requirements.

of voters in that county.[4] Authorized representatives of respondent Hite refused to register petitioners because of their inability to prove literacy in English and sign the required affidavit attesting to such literacy.

After having thus been denied registration, petitioners instituted the present action challenging the constitutionality of the English literacy requirement and seeking the following relief: (a) A declaration that the English literacy requirement of article II, section 1 is unconstitutional as applied to them and to other Spanish literates; (b) mandatory relief requiring respondents to register petitioners; and (c) mandatory relief requiring respondents to print a reasonable percentage of the ballots at each election in Spanish, or otherwise to facilitate their ability to vote in Spanish.

The case was tried on the basis of the pleadings, evidence contained in a stipulation of facts, and documentary evidence submitted by the petitioners. Petitioners sought to prove that they have access to Spanish language periodicals, newspapers and other communication media adequate to inform themselves about local, state and national issues and candidates. Included in the stipulation, for this purpose, were the names, estimated circulations, and brief descriptions of 17 newspapers and 11 magazines printed wholly or partially in Spanish and available to residents of Los Angeles County. Petitioners also sought to prove that the historical purpose of the English literacy requirement was to disenfranchise immigrant groups on the basis of their ancestry and national origin. To this end, petitioners introduced substantial documentary evidence setting forth debates in the State Assembly regarding the proposed constitutional amendment which added the literacy requirement to article II, section 1, contemporary newspaper editorial comment, and letters purporting to demonstrate the popular attitude toward the requirement.[5] Respondents introduced no evidence on either issue. They included, however, in the stipulation of facts, a list of the schools maintained by the Los Angeles Unified School District at which instruction in English as a second language is provided, without tuition, for non-English speaking adults.

The trial court gave judgment for respondents. It refused petitioners' proposed finding to the effect that residents of Los Angeles County who were literate only in Spanish would be able adequately to identify and familiarize

---

[4]After this action was filed, the office of the registrar of voters was joined with the office of the recorder and Ray Lee appointed to the consolidated position of registrar-recorder. Mr. Lee was substituted by stipulation as a party respondent in place of Ben Hite.

[5]It was stipulated that the materials introduced were true and correct copies of writings or portions of writings the originals of which are located at the Bancroft Library of the University of California at Berkeley and the State Library at Sacramento. (See Evid. Code, §§ 1401, 1500.)

themselves with political candidates and issues from Spanish-language news media, on the ground that the record did not contain sufficient evidence as to the contents of and coverage afforded by such media.[6] It likewise refused petitioners' proposed finding on the issue of discriminatory legislative and popular intent in enacting the literacy requirement. Viewing *Lassiter* v. *Northampton Election Bd.* (1959) 360 U.S. 45 [3 L.Ed.2d 1072, 79 S.Ct. 985], as dispositively upholding the constitutionality of literacy tests, the court concluded that a requirement of literacy in English is a rational state policy, that the challenged provision is designed to serve a legitimate state interest, that its classifications are valid and nondiscriminatory and that it is, accordingly, constitutional on its face and as applied both to petitioners and to all persons who are literate in Spanish but not in English.[7]

We do not propose to consider in detail the substantial evidence which petitioners introduced in an effort to establish that the English literacy requirement was a direct product of the narrow and fearful nativism rampant in California politics at the end of the nineteenth century.[8] We refrain from doing so in part because inquiry into legislative intent or motive is a perplexing conceptual and epistemological problem and, for the judiciary, a "hazardous" undertaking at best. (*Flemming* v. *Nestor* (1960) 363 U.S. 603, 617 [4 L.Ed.2d 1435, 1448, 80 S.Ct. 1367]; see also discussion in *Developments in the Law—Equal Protection* (1969) 82 Harv.L.Rev. 1065, 1091-1097.) A more practical reason for our restraint is, as petitioners concede, that the question of motive is not determinative of the present

---

[6]The court's finding of fact on this issue stated simply: "The amount of written material in Los Angeles County relating to public or political issues printed in English exceeds that printed in Spanish."

[7]No charge is made that the literacy requirement is applied in any but an impartial manner. On the contrary, it was stipulated that respondent Hite, "to the best of his ability, administers the English literacy requirement of Article II, Section 1 of the California Constitution fairly and uniformly." Thus we need not stop to consider the argument (made not by petitioners but by an amicus curiae) that because of the lack of standards set out in the constitutional provision, the provision under review is equivalent to a grant of uncontrolled discretion to county voting registrars to determine who is and is not literate in English. Such discretion in administrative officials over fundamental rights is traditionally suspect (see *Saia* v. *New York* (1948) 334 U.S. 558, 560-562 [92 L.Ed. 1574, 1577-1578, 68 S.Ct. 1148]) and was condemned in the context of literacy tests in *Louisiana* v. *United States* (1956) 380 U.S. 145, 153 [13 L.Ed.2d 709, 714, 85 S.Ct. 817].

[8]California was a stronghold of the American Protective Association (A.P.A.), a powerful anti-immigrant political party which advocated an English literacy requirement as a method of disenfranchising voters of foreign ancestry. (D. Kinzer, An Episode of Anti-Catholicism (University of Washington Press, 1964), pp. 15-16; B. Soloman, Ancestors and Immigrants (Harvard University Press, 1956), pp. 115-117, 196-198.) During its heyday, 1890-1897, two of the A.P.A.'s national officers were Californians and the nativist group published several newspapers and magazines in the state. (Kinzer, *op. cit.,* pp. 254-258.)

constitutionality of the literacy requirement. (See *United States* v. *O'Brien* (1968) 391 U.S. 367, 382-386 [20 L.Ed.2d 672, 683-685, 88 S.Ct. 1673].) We cannot accept, however, respondents' contention that because the requirement is fair on its face and not unfairly administered, evidence of a discriminatory purpose in its enactment is irrelevant.

One of the primary purposes of the Fourteenth Amendment was to strike down discriminatorily motivated state legislation directed against racial minorities.[9] (*McLaughlin* v. *Florida* (1964) 379 U.S. 184, 192 [13 L.Ed.2d 222, 228, 85 S.Ct. 283].) Thus "Irrespective of the express terms of a statute, particularly in the area of racial discrimination, courts must determine its purpose as well as its substance and effect. . . . '[A]cts generally lawful may become unlawful when done to accomplish an unlawful end.' [Citation.]" (Fn. omitted.) (*Hall* v. *St. Helena Parish School Board* (E.D. La. 1961) 197 F.Supp. 649, 652, affd. per curiam (1962) 368 U.S. 515 [7 L.Ed.2d 521, 82 S.Ct. 529].) In *Katzenbach* v. *Morgan* (1966) 384 U.S. 641 [16 L.Ed.2d 828, 86 S.Ct. 1717], the court mentions "evidence suggesting that prejudice played a prominent role in the enactment of [New York State's English literacy] requirement" (Fn. omitted.) (384 U.S. at p. 654 [16 L.Ed.2d at p. 837]), as among the grounds upon which Congress could reasonably have concluded that the requirement violated the Fourteenth Amendment.[10] Just last term, in a case involving a challenge to Ohio's electoral laws, the court stated, "In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, . . ." (*Williams* v. *Rhodes* (1968) 393 U.S. 23, 30 [21 L.Ed.2d 24, 31, 89 S.Ct. 5]. See also this court's discussion of the relevance of historical context in *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 534 [50 Cal.Rptr. 881, 413 P.2d 825], affd. (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627].) The following summary of the evidence, therefore, is intended simply to provide a brief account of the origin of the California literacy requirement. It is relevant to an understanding of our

---

[9]The United States Supreme Court has applied the Fourteenth Amendment to bar state-imposed discrimination based upon ancestry, whether racial or national. (See, e.g., *Loving* v. *Virginia* (1967) 388 U.S. 1, 11 [18 L.Ed.2d 1010, 1017, 87 S.Ct. 1817] ("race"); *Hernandez* v. *Texas* (1954) 347 U.S. 475, 482 [98 L.Ed. 866, 872, 74 S.Ct. 667] ("national origin or descent"); *Hirabayashi* v. *United States* (1943) 320 U.S. 81, 100 [87 L.Ed. 1774, 1785, 63 S.Ct. 1375] ("ancestry" and "race"); *Truax* v. *Raich* (1915) 239 U.S. 33, 41 [60 L.Ed. 131, 135, 36 S.Ct. 7] ("race or nationality"); *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 369 [30 L.Ed. 220, 226, 6 S.Ct. 1064] ("race, color, or nationality").)

[10]The evidence to which the court referred included statements made by the sponsor of the measure, "reinforced by an understanding of the cultural milieu at the time of proposal and enactment, spanning a period from 1915 to 1921—not one of the enlightened eras of our history." (384 U.S. 654, fn. 14 [16 L.Ed.2d 837].)

ultimate conclusion that the requirement violates petitioners' rights under the Fourteenth Amendment, but it is in no way crucial to that holding.

The English literacy requirement was introduced as a proposed constitutional amendment in the State Assembly in 1891. Its author was Assemblyman A. J. Bledsoe who, five years previously, had been a member of the vigilante Committee of Fifteen which expelled every person of Chinese ancestry from Humboldt County.[11]

Assemblyman Bledsoe was forthright about the purposes of his amendment. In introducing it he quoted from article V of the 1890 platform of one of the major political parties:

"We look with alarm upon the increased immigration of the illiterate and unassimilated elements of Europe, and believe that every agency should be invoked to preserve our public lands from alien grasp, to shield American labor from this destructive competition, and to protect the purity of the ballot-box from the corrupting influences of the disturbing elements . . . from abroad."[12] He continued: "If we do not take some steps to prevent the ignorant classes, who are coming here from Europe, unloading the refuse of the world upon our shores, from exercising the right of suffrage until they have acquired knowledge of our Constitution, our system of government, and our laws, it will soon come to pass that this element will direct in our politics and our institutions will be overthrown."[13] Neverthe-

---

[11]Carranco, *Chinese Expulsion from Humboldt County* (1961) 30 Pacific Historical Review, pp. 329, 332. Both the Chinese and Japanese were subjected to widespread and systematic discrimination. The Constitution adopted in 1879 excluded "natives of China" from voting. In 1891 the children of those thus excluded were nearing voting age and, since the Chinese tended to retain their language and customs, partly as a response to intense discrimination, the proposed literacy test would serve to prevent them from voting as well. (See Gaylord, "History of the California Election Laws," West's Elec. Code, p. 41.) The judiciary was not immune from anti-Chinese prejudices. Chief Justice Murray termed the Chinese a "distinct people . . . whose mendacity is proverbial; a race of people whom nature has marked as inferior, and who are incapable of progress or intellectual development beyond a certain point, as their history has shown; . . ." (*People* v. *Hall* (1854) 4 Cal. 399, 404-405.)

[12]The debate in the Assembly was not recorded. Mr. Bledsoe's remarks are derived from the record of the debate printed in the Sacramento Record Union, January 20, 1891. Where there is no official record of debate "newspaper articles [quoting debate] are admissible to show purpose." (*United States* v. *State of Louisiana* (E.D. La. 1963) 225 F.Supp. 353, 375, fn. 59, affd. (1965) 380 U.S. 145 [13 L.Ed.2d 709, 85 S.Ct. 817].)

[13]Fear of growing influence of alien classes appears to be a traditional impetus for literacy requirements. "Throughout the greater part of its history the literacy test for voters has been used as a weapon against specific groups which . . . were considered dangerous to the dominant group. Its convenience as a method of restricting the suffrage without violating the fundamentals of democratic dogma . . . was recognized as early as 1795, when it was incorporated into the constitution of the year III in order to keep the sans-culottes from the polls. . . . In the United States it was first introduced in Connecticut in 1855 and two years later in Massachusetts, the

less, the Assembly remained unconvinced and the proposal was defeated on January 21, 1891. (Assembly Journal (1891) p. 143.) This setback was only temporary; an immediate flood of petitions to the Assembly favoring the literacy requirement resulted in passage of legislation which placed it up for an advisory vote at the 1892 election. (Assembly Journal (1891) pp. 332, 378, 425, 448, 623; Senate Journal (1891) p. 684.)

The advisory vote showed overwhelming support for the Bledsoe proposal and in 1893 the Legislature hastened to adopt it as a constitutional amendment subject to ratification at the next general election. (Assembly Journal (1893) p. 178; Senate Journal (1893) p. 214.) The English literacy requirement was again approved by the people in 1894 and became part of article II, section 1, which set forth existing voter qualifications.[14]

It is obvious that fear and hatred played a significant role in the passage of the literacy requirement. Perhaps a genuine desire to create an intelligent and responsible electorate was equally important for many of its supporters. We, no more than the trial court, need decide this issue. Our primary task is to determine whether the challenged provision is compatible with the demands of equal protection as they apply in contemporary society. Its historical origin, whether odious or admirable, cannot fully answer that question.

The last decision of the Supreme Court to rule directly[15] upon the consti-

---

occasion being the inpour of tumultous Irish immigrants and the organizers of native American indignation being the Know-Nothing party." H. Sullivan, "Literacy and Illiteracy," 5 Encyclopedia of the Social Sciences (Macmillan 1937) pp. 511, 520.

[14]Newspaper editorial support for the proposal prior to the crucial 1892 advisory vote followed the tenor of the earlier debate in the Assembly. It appears, from the evidence in the record, that scant attention was given to discussion of the merits of the literacy requirement as a neutral method of promoting an informed electorate. Rather, adoption was urged in order to "Wipe out the ignorant foreign vote" (Redlands Facts, September 23, 1892), to exclude, from voting at least, the "increasing flood of debased and ignorant Europeans" (Anaheim Gazette, September 8, 1892), the "thousands of ignorant and vicious, illiterate and reckless [immigrants]," (The Argonaut, November 7, 1892) and the "ignorant and vicious foreigners who are a constant menace to our free institutions." (San Bernardino Weekly Courier, October 8, 1892.)

[15]The court has considered the issue of English language literacy tests as applied to those literate only in Spanish in two cases decided subsequently to *Lassiter: Katzenbach* v. *Morgan, supra*, 384 U.S. 641 and *Cardona* v. *Power* (1966) 384 U.S. 672 [16 L.Ed.2d 848, 86 S.Ct. 1728]. In those cases, however, the court did not itself pass on the constitutionality of such tests under the equal protection clause. *Katzenbach* involved section 4(e) of the Voting Rights Act of 1965, which invalidated state English literacy requirements as applied to certain foreign language literates—principally Spanish-speaking residents of New York State. The decision was limited to holding that section 4(e) was a proper exercise of the power vested in Congress under section 5 of the Fourteenth Amendment and that Congress could reasonably have concluded that the imposition of such tests on those literate in Spanish in the geo-

tutionality of state literacy requirements under the equal protection clause is *Lassiter* v. *Northampton Election Bd., supra,* 360 U.S. 45, relied on by the courts below. In *Lassiter,* a Negro resident, qualified to vote except for her refusal to submit to a literacy test, challenged the provision of the North Carolina Constitution which required it. A unanimous court upheld the constitutionality of the test. Pointing out that states "have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised," the court held that the right to vote, while guaranteed by the federal Constitution, was subject to the imposition of nondiscriminatory state standards. Since the ability to read and write was "neutral on race, creed, color and sex" and bore "some relation to standards designed to promote intelligent use of the ballot" literacy (like age, citizenship, residency, and previous criminal record) could legitimately be considered in determining voter qualifications. (360 U.S. 45 at pp. 50-51 [3 L.Ed.2d 1072 at pp. 1076-1077].)

Putting to one side for the moment the court's subsequent rulings on state laws which restrict or dilute voting power, it is nevertheless apparent that *Lassiter* does not control our decision here. The appellant in *Lassiter* made no claim to literacy in any language other than English or to access to news media written in any other language. The constitutional issue, therefore, was whether the distinction between literate citizens and those totally illiterate was a permissible one upon which to condition access to the polls. We do not here face the general question of a nondiscriminatory literacy requirement which *Lassiter* upheld; we confront a provision which discriminates *among* literate citizens, disenfranchising all who are literate in languages other than English, as well as those literate in no language. Justice Douglas, the author of the opinion in *Lassiter,* made the distinction explicit in his dissent in *Cardona* v. *Power, supra,* 348 U.S. 672, stating "A State has broad powers over elections; and I cannot say that it is an unconstitutional exercise of that power to condition the use of the ballot on the ability to read and write. That is the only teaching of *Lassiter.* . . But we are a multi-racial and multi-lin-

---

graphic area to which the section in fact principally applied was a violation of equal protection. *Cardona* was initiated by a Spanish literate before the enactment of section 4(e). The New York Court of Appeals held (4 to 3) that the English literacy requirement was constitutional. (16 N.Y.2d 639 [261 N.Y.S.2d 78, 209 N.E.2d 119].) The Supreme Court remanded for the purpose of determining whether the case had been rendered moot by the enactment of section 4(e) and the issue presented by the instant case was specifically left open by the majority opinion. (See Bikel, *The Voting Rights Cases,* 1966 Sup. Ct. Rev. 79, 96.) Four members of the court would have reached the constitutional issue. Justices Douglas and Fortas would have held New York's literacy requirement unconstitutional as applied to those literate in Spanish. (384 U.S. 675-677 [16 L.Ed.2d 850-851].) Justices Harlan and Stewart would have held the literacy requirement constitutional under the equal protection clause. (384 U.S. 659-664 [16 L.Ed.2d 840-843].)

guistic nation; . . . And so our equal protection question is whether intelligent use of the ballot should not be as much presumed where one is versatile in the Spanish language as it is where English is the medium." (384 U.S. at pp. 675-676 [16 L.Ed.2d at pp. 850-851].)[16]

However, although *Lassiter* does not govern the constitutionality of excluding literate persons from the polls, it does identify the permissible state interest to be served by excluding illiterates: the promotion of an " 'independent and intelligent' exercise of the right of suffrage." (Fn. omitted.) (360 U.S. at p. 52 [3 L.Ed.2d at p. 1077].) What we must decide in this case is whether, applying the constitutional standards which have evolved since *Lassiter,* California's presumed desire for "intelligence" and "independence" in voting may be satisfied by the exclusion of those of its citizens who, while unable to read the dominant language, English, nonetheless have access to, and the ability to utilize, those materials available through Spanish language publications.

*Lassiter* did not overtly adopt a standard by which the compatibility of the legislative classifications with the equal protection clause was to be determined. After having assured itself that no racially discriminatory purpose or application was involved, however, the court gave only a cursory examination to the relationship between literacy and intelligent voting.[17] No effort was made to rationalize the admitted lack of congruity between the class of intelligent voters and the classes of literate citizens and illiterate citizens. Nor was there an attempt to balance the detriment imposed on those excluded from voting against the gain in the quality of the franchise reasonably to be expected from their exclusion. In sum, the court invested the legislation with a presumption of constitutionality and deferred to a legislative decision for which rational grounds could be suggested—the posture traditionally associated with review of fiscal and economic regulatory matters.[18]

---

[16]See also *United States* v. *County Board of Elections of Monroe County, N. Y.* (W.D.N.Y. 1965) 248 F.Supp. 316, 322, which correctly anticipated the distinction drawn in *Cardona:* "In *Lassiter* . . . the English-language aspect of the [literacy requirement] law was not before the Court since no claim was made that the plaintiff was literate in a foreign language."

[17]In fact, the court admitted that the correlation between the purpose and the classifications used to achieve it was not perfect. "Literacy and intelligence are obviously not synonymous. Illiterate people may be intelligent voters." (360 U.S. at p. 52 [3 L.Ed.2d at p. 1077].) The other proposition, left implicit in the opinion, is also obvious—literate people may vote very unintelligently. No explanation was considered necessary to justify the under-inclusiveness and over-inclusiveness of the statutory scheme. (See Tussman and tenBroek, *The Equal Protection of the Laws* (1949) 37 Cal.L.Rev. 341, 344-353, wherein the authors propose that a "reasonable classification is one which includes all persons who are similarly situated with respect to the purpose of the law" and excludes all others.) (*Id.* at p. 346.)

[18]See, e.g., *Williamson* v. *Lee Optical Co.* (1955) 348 U.S. 483, 489 [99 L.Ed. 563,

Commencing with the reapportionment decisions following *Baker* v. *Carr* (1962) 369 U.S. 186 [7 L.Ed.2d 663, 82 S.Ct. 691], the high court has given ever-increasing recognition to the importance of the franchise and has abandoned the tolerance of *Lassiter* in favor of strict scrutiny of restrictions on it. For example in *Wesberry* v. *Sanders* (1964) 376 U.S. 1 [11 L.Ed.2d 481, 84 S.Ct. 526], the court observed that "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." (376 U.S. at pp. 17-18 [11 L.Ed.2d at p. 492].) In *Reynolds* v. *Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362], the court made explicit the need for more rigorous and critical analysis of legislation restricting or denying the right to vote. Comparing such restrictions on the right to vote to the compulsory sterilization laws struck down by *Skinner* v. *Oklahoma* ex rel. *Williamson* (1942) 316 U.S. 535 [86 L.Ed. 1655, 62 S.Ct. 1110], the court characterized the right of suffrage as "a fundamental matter in a free and democratic society. Especially since the right . . . is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." (377 U.S. at pp. 561-562 [12 L.Ed.2d at p. 527].) More significant than the language used was the result in *Reynolds,* i.e., the invalidation under the equal protection clause of classifications despite the fact that such classifications were supported by a "clearly rational state policy of according some legislative representation to political subdivisions, . . ." (377 U.S. 581 [12 L.Ed.2d 539].) *Reynolds* signalled the end to approval of restrictions on the right to vote once a rational connection between the constraint and a legitimate state policy was demonstrated.

The following year, in *Carrington* v. *Rash* (1965) 380 U.S. 89 [13 L.Ed. 2d 675, 85 S.Ct. 775], the court for the first time held state voter qualifications subject to the equal protection clause. (See the dissenting opinion of Harlan, J., 380 U.S. at pp. 97-99 [13 L.Ed.2d at pp. 681-682].) *Carrington* held invalid a provision of the Texas Constitution prohibiting all members of the armed forces from voting in any election, on the conclusive assumption that they were not state residents. While restricting the franchise to Texas residents was considered a legitimate state objective, the disenfranchising classification was invalid since it was both under-inclusive and over-inclusive (see, fn. 17, *ante*). Less restrictive alternatives were available and, although more costly and difficult to administer, were required by the equal protection clause.

---

573, 75 S.Ct. 461]; *Developments in the Law—Equal Protection, supra,* 82 Harv.L. Rev. 1077-1087 and cases cited therein.

In *Harper* v. *Virginia Board of Elections* (1966) 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079], the court struck down as violative of the equal protection clause of the Fourteenth Amendment a provision of the Virginia Constitution and implementing Virginia statutes conditioning the right to vote upon the payment of a poll tax. Declaring that "Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process," the court termed such a requirement an " 'invidious' discrimination [citation] that runs afoul of the Equal Protection Clause." (383 U.S. at p. 668 [16 L.Ed.2d at p. 173].) Yet both dissenting opinions proposed justifications for a poll tax which are certainly rational. (E.g., Justice Harlan's suggestion that the "payment of some minimal poll tax promotes civic responsibility, weeding out those who do not care enough about public affairs to pay $1.50 . . . a year for the exercise of the franchise.") (383 U.S. at p. 685 [16 Ed.2d at p. 183].) The clear implication of *Harper* is that more than "rationality" must be demanded of state voter qualifications. The case thus represents the conjunction between the more exacting standard of review set out in *Reynolds, supra,* and the extension of the equal protection clause to cover voter qualification laws accomplished by *Carrington, supra.*[19]

The necessity to impose more stringent equal protection standards to disenfranchising legislation, implicit in *Harper,* was stated explicitly in two cases decided last term, *Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886] and *Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897]. The court announced the new constitutional standard in a terse paragraph in *Kramer*: "Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the government affairs which substantially affect their lives. Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship [20] and denies the franchise to others, the Court must determine whether the exclusions are *necessary* to promote a compelling state interest." (Fn.

---

[19] We noted the significance of *Harper* in *Otsuka* v. *Hite* (1966) 64 Cal.2d 596 [51 Cal.Rptr. 284, 414 P.2d 412], a case involving a challenge to another of the disenfranchising provisions of article II, section 1 of our state Constitution. We there observed: "In ruling on the validity of state-imposed restrictions on this fundamental right the United States Supreme Court has in effect tended to apply the principle that the state must show it has a compelling interest in abridging the right, and that in any event such restrictions must be drawn with narrow specificity." (64 Cal.2d at p. 602.)

[20] The omission of literacy from this list of requirements is significant. Previously, in cataloging permissible state grounds for voter disqualification, the court had included literacy along with age, citizenship and residence. The inference seems inescapable that statutes imposing literacy requirements are among those to which courts must apply the analysis indicated in *Kramer*.

omitted.) (Italics added.) (395 U.S. 621, 626-627 [23 L.Ed.2d 583, 589].)[21] At issue in *Kramer* was a New York statute which limited the vote in local school district elections to owners or lessees of taxable property, their spouses, and parents or guardians of children attending district schools —that is to those persons thought to be " 'primarily interested' in school affairs" including those " 'directly' affected by property tax changes . . . ." (395 U.S. at p. 631 [23 L.Ed.2d at p. 592].) Without deciding whether a state could properly limit voter elegibility in certain elections to those considered to have a unique interest in the outcome, the court held the statutory restrictions invalid. Assuming that New York could legitimately limit the franchise in school district elections to those primarily concerned with school affairs, the statute failed to accomplish that purpose with adequate "precision." Noting that the classifications "permit inclusion of many persons who have, at best, a remote and indirect interest" while excluding others "who have a distinct and direct interest" the court held the statutes invalid since they did "not meet the exacting standard of precision [required] of statutes which selectively distribute the franchise." (395 U.S. at p. 632 [23 L.Ed.2d at p. 592].)[22]

The issue before us, therefore, is whether California's restriction of the

---

[21]*Kramer* also provided an additional justification for the "special scrutiny" to which the New York statute was subjected, a justification obviously relevant to the case at hand. The usual doctrinal rationale is that the franchise occupies a unique position in a democracy. (See, e.g., *Carrington* v. *Rash, supra,* 380 U.S. 89, 96 [13 L.Ed.2d 675, 680]: "close to the core of our constitutional system"; *Reynolds* v. *Sims, supra,* 377 U.S. 533, 555 [12 L.Ed.2d 506, 523]: "of the essence of a democratic society.") *Kramer* observed that judicial deference to legislative judgments and the approval given "rational" classifications is based on the assumption that "the institutions of state government are structured so as to represent fairly all the people. However, when the challenge to the statute is in effect a challenge of this basic assumption" the traditional deference of the judiciary is illogical and inappropriate. (395 U.S. 621 at p. 628 [23 L.Ed.2d 583 at p. 590]. See also *The Supreme Court, 1968 Term* (1969) 83 Harv.L.Rev. 7, 81-82.)

[22]*Cipriano* v. *City of Houma, supra,* 395 U.S. 701 was decided on the same ground of imprecision of classification. The court in *Cipriano* held that a Louisiana law confining the vote in a municipal utility revenue bond issue election to "property taxpayers" denied equal protection to those excluded who were equally interested in or affected by the election results. See also *Hall* v. *Beals* (1969) 396 U.S. 45 [24 L.Ed.2d 214, 90 S.Ct. 200], which involved a challenge to state durational residency requirements in presidential elections. The majority dismissed the case as moot. Dissenting, Justices Marshall and Brennan would have reached the merits and declared the residency requirement unconstitutional: "[I]f it was not clear in 1965 it is clear now that once a State has determined that a decision is to be made by popular vote, it may exclude persons from the franchise only upon a showing of a compelling interest, and even then only when the exclusion is the least restrictive method of achieving the desired purpose. *Harper* v. *Virginia Board of Elections,* 383 U.S. 663, 667 [16 L.Ed.2d 169. 172. 86 S.Ct. 1079] (1966); *Kramer* v. *Union School District,* 395 U.S. 621, 626-628 [23 L.Ed.2d 583, 589-590, 89 S.Ct. 1886] (1969)." (396 U.S. at p. 52 [24 L.Ed.2d at p. 220].)

right to vote to those literate in English is necessary to achieve a compelling state interest.

The most obvious nondiscriminatory[23] purpose which a literacy test serves (and one which *Lassiter* intimated was the *only* permissible purpose, 360 U.S. at p. 51 [3 L.Ed.2d at p. 1076]) is to confine participation in the electoral process to those who, because of their access to printed sources of political and electoral information, are thought capable of some degree of intelligence and independence in their voting. Since *Lassiter,* the Supreme Court appears to have implicitly accepted the purpose of ensuring informed voting as a valid justification for restricting the franchise. *Harper* held the poll tax unconstitutional precisely because it did *not* measure "ability to participate intelligently in the electoral process." (383 U.S. at p. 668 [16 Ed.2d at p. 173].) Similarly, in the instant case, we believe that California's concern that those of her citizens who are eligible to vote likewise be capable of informed decisions on matters submitted to the electorate, constitutes a "compelling" state interest.[24]

Whether this conceded state interest in an informed electorate necessitates a literacy requirement is less obvious today than when *Lassiter* was decided, in light of the wider availability and greater sophistication of nonwritten modes of communication (i.e., radio and, especially, television). The question of the validity of literacy requirements per se is not before us, however, and we intimate no opinion in the matter. The question which is raised is whether this interest necessitates that literacy, if required, be limited to lit-

---

[23]See footnote 13, *ante.*

[24]The only extended judicial discussion of the history of the "compelling interest" doctrine is that of Harlan, J., dissenting in *Shapiro* v. *Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, at pp. 627-631, 89 S.Ct. 1322]. The contours of compulsion are not clearly discernible. *Compare Korematsu* v. *United States* (1944) 323 U.S. 214 [89 L.Ed. 194, 65 S.Ct. 193] (wartime conditions of "direst emergency and peril" (*id.* at p. 220 [89 L.Ed. at p. 201]) did constitute "pressing public necessity" (*id.* at p. 216 [89 L.Ed. at p. 199])); *Otsuka* v. *Hite, supra,* 64 Cal.2d 596, 602-603 (need to prevent election frauds which could affect election outcome held to be a "compelling state interest.") *with Bates* v. *Little Rock* (1960) 361 U.S. 516, 524 [4 L.Ed.2d 480, 486, 80 S.Ct. 412] (occupational licensing tax administration held not sufficiently "compelling" to warrant compulsory disclosure of association's membership list); *Sherbert* v. *Verner* (1963) 374 U.S. 398, 406 [10 L.Ed.2d 965, 971, 83 S.Ct. 1790] (preventing fraudulent welfare claims not compelling enough to support infringement on First Amendment religious rights); *McLaughlin* v. *Florida, supra,* 379 U.S. 184, 192-193 [13 L.Ed.2d 222, 228-229] (restraining sexually indecent conduct not an "overriding statutory purpose" so as to justify racial classification); *Williams* v. *Rhodes, supra,* 393 U.S. 23, 31-33 [21 L.Ed.2d 24, 31-32] (state desire for two-party system, majority rather than plurality election, and prevention of voter confusion not "compelling" enough to support limiting rights of voting and association); *Shapiro* v. *Thompson, supra,* 394 U.S. 618, 634-638 [22 L.Ed.2d 600, 615-617] (facilitation of budgetary planning, providing objective residency standards, encouraging rapid entry into work force and minimizing welfare frauds not adequately "compelling" to permit restriction on right to travel).

eracy in *English*. The answer, after *Kramer* and *Cipriano*, depends on whether those excluded—residents literate in Spanish—are substantially more isolated from political events and issues (hence more likely to exercise the franchise in an uninformed manner) than are those whom the law includes. This, of course, in turn depends upon the amount of politically relevent information available to them in Spanish.

At trial, the petitioners introduced evidence of a substantial network of Spanish language news media to which, as residents of Los Angeles County, they have ready access.[25] This evidence, the accuracy of which was stipulated to by respondents, reveals that eight Spanish language newspapers are published in Los Angeles County, two of which are published daily, the remainder at weekly intervals.[26] Nine additional Spanish language newspapers which are published elsewhere in the United States, in Mexico, or in South America also circulate in Los Angeles County.[27] Eleven Spanish language magazines are available, two of which, *Grafica* and *La Raza,* are published in Los Angeles and are devoted primarily to discussion of national and local political affairs. The nine remaining include Spanish translations of Life (*Life en Espanol*) and Readers' Digest (*Selecciones*). Apart from what has been set forth above, the stipulation contained only fragmentary information as to the content or quality of the Spanish language news media and the trial court made no findings as to the availability of political information to those situated as are petitioners.

█ Petitioners contend on appeal, as they did in the court below, that their proof of access to 17 Spanish language newspapers and 11 Spanish language magazines was sufficient to shift to respondents the burden of producing evidence to show that the newspapers involved do *not* provide their readers with information about political candidates, events and issues. (Evid. Code § 550.) In the absence of such rebutting evidence, they assert, the trial court erred in not finding that some of the material in evidence was devoted, at least to the degree that typical English language newspapers are,

[25]The parties stipulated that the question of petitioners' access to Spanish language political information be determined on the basis of materials available in Los Angeles County alone, without regard to the balance of the state.

[26]The daily newspapers published in Los Angeles County are *La Opinion* and *El Mexicano.* Those published weekly include *El Pueblo,* Mexican American Sun, Eastside Sun, Wynerwood Chronicle, Eastside Journal and Belvedere Citizen. The five last mentioned papers are only partially printed in Spanish. During election campaigns, however, the amount of Spanish language material increases due to advertising by political figures.

[27]These papers are *Excelsior, La Prensa, Diario las Americas, Novedades, El Tiempo, El Sol de Mexico* (all of which are published daily) and *La Nacion, El Heraldo* and *El Fronterizo,* which are published weekly.

to news of political significance.[28] We concur. In light of the evidence presented by this record, the facts required to be judicially noticed by us,[29] and in the absence of any evidence[30] indicating any substantial difference between the newspapers described in the stipulation of the parties and those English language publications commonly denominated as "newspapers," we are satisfied that petitioners have demonstrated access to materials printed in Spanish which communicate substantial information on matters, not only of national, but also of state and local political concern.

██ It is in this factual context that the necessity of excluding petitioners from any orderly and effective expression of their political preferences must be judged.

Respondents argue that the question as to how much information is necessary or desirable for a voter to have access to, in order to insure his intelligent and independent exercise of the franchise, is one to be determined by the Legislature and that California has decided that voters should "have access to that quantum of information, comment and argument concerning candidates and issues as is available only to those who can read English." This, of course, simply begs the question. More importantly, it fails to recognize that the issue is not what is "desirable" nor whether the legislative judgments are reasonable. "A more exacting standard obtains" (*Kramer* v. *Union School District, supra,* 395 U.S. at p. 633 [23 L.Ed.2d at p. 593]), which respondents' argument fails to meet.

First, respondents appear to misapprehend the permissible state goal. No case has intimated that a "compelling state interest" requires restriction of the franchise to persons manifesting the political acumen generated by the

---

[28]Petitioners rely, in support of this contention, on Evidence Code section 451 which provides, in pertinent part, that "Judicial notice *shall* be taken of: . . . (e) The true signification of all English words and phrases . . . ." (Italics added.) Webster's Third New International Dictionary of the English Language, Unabridged, defines a "newspaper" as "a paper that is printed and distributed daily, weekly, or at some other regular and usu[ally] short interval that contains news, articles of opinion (as editorials), features, advertisements, or other matter regarded as current or new." Magazines, on the other hand, do not as a matter of definition devote themselves in part to political matters and petitioners' showing in this regard is limited to the stipulated degree of political coverage in *Grafica* and *La Raza.* But a publication which, appearing at daily or weekly intervals, consistently and studiously ignores political news is simply not a "newspaper" in the common understanding of that term in our language and culture.

[29]Evidence Code, section 459 provides in relevant part as follows: "(a) The reviewing court *shall* take judicial notice of (1) each matter properly noticed by the trial court and (2) each matter that the trial court was required to notice under Section 451 or 453 [of the Evid. Code]." (Italics added.)

[30]Evidence Code, section 550 provides in pertinent part: "The burden of producing evidence as to a particular fact is on the party against whom a finding on that fact would be required in the absence of further evidence."

use of even a fraction of that "quantum of information, comment and argument . . . available only to those who can read English." (See fn. 24, *ante.*) Elaborate educational qualifications for voters are incompatible with our commitment to full and equal participation in the political life of the nation. (See, e.g., *Baker* v. *Carr, supra,* 369 U.S. 186; *Harper* v. *Virginia Board of Elections, supra,* 383 U.S. 663; *Williams* v. *Rhodes, supra,* 393 U.S. 23.) The state may have a compelling interest in establishing standards which tend to ensure a minimal degree of competence and capacity to become informed. It has no such interest in excluding voters who meet these standards on the ground that they do not also have access to mammoth quantities of information which the state does not and could not demand that other voters utilize. Exclusion of all who cannot read English is obviously *necessary* to accomplish the goal of creating an electorate which can read all material of political significance printed in English. While that may be a desirable state policy it is hardly so compelling that it justifies denying the vote to a group of United States citizens who already face similar problems of discrimination and exclusion in other areas and need a political voice if they are to have any realistic hope of ameliorating the conditions in which they live.[31]

---

[31]Respondents suggest additional goals to be served by the English literacy requirement. *First,* they advance the notion that restricting the franchise in this manner permits only those who can "mingle" with and "have contact with" the entire electorate to vote, and excludes those who confine their business and social contacts to a small minority group. Presumably, this results in a more knowledgeable electorate. But while such catholic intermingling may be an admirable ideal, it does not appear *necessary* to achieve an electorate which has access to sufficient information to make intelligent electoral decisions. And to the extent that it indicates a fear of and effort to preclude the unified expression of minority community political sentiment, it is constitutionally unacceptable. (See *Carrington* v. *Rash, supra,* 380 U.S. 89, 94 [13 L.Ed.2d 675, 679]: " 'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible.") *Second,* respondents suggest that limiting the franchise to English literates will exclude those "so indifferent to the language and political affairs of their country . . . that they would not exercise the franchise with responsibility." Exclusion of the indifferent, however, is far from a compelling state interest, especially since it is left to conjecture how indifference leads to a serious lack of "perspective." In any event, the indifferent may, presumably by definition, be relied on to exclude themselves with far greater precision than is possible through legislation and without legislation's concomitant exclusion of those who, like petitioners, are vitally interested but unable to read English. Precision is crucial to the constitutionality of any state effort to select out for interest. (See *Cipriano* v. *City of Houma, supra,* 395 U.S. 701, 704-706 [23 L.Ed.2d 647, 650-652].) *Finally,* respondents maintain that this limitation on eligible voters excludes those "so . . . intellectually incapable" that they, too, could be expected to exercise the franchise without perspective. The mysterious quality of "perspective" remains undefined, but even assuming an adequate definition were provided, the argument is unpersuasive. California has already established minimum standards of mental acuity required of eligible voters; it excludes "idiots" and "insane persons." (Cal. Const., art. II, § 1.) Should California desire additional, more stringent, intellectual standards, it must adopt a far more accurate method of measuring the relevant quality, intelligence, than is provided by the crude and psychologically unsupported expedient of equating linguistic ability with intelligence.

Second, respondents have in no way demonstrated that access to the full range of political commentary available in English is *necessary* to achieve an electorate capable of informing itself sufficiently to make intelligently self-interested choices at the polls—which is the more modest state interest we accept as compelling. In light of evidence disclosing a significant number and diversity of sources of political information available in Spanish to petitioners, it is futile to contend that they are substantially less able than are most voters literate in English to inform themselves about candidates for elective office or issues whose resolution is submitted to the people. It is only such a substantial distinction between classifications that will satisfy the "exacting standard of precision" demanded by the United States Constitution of state laws which "selectively distribute the franchise." (*Kramer* v. *Union School District, supra,* 395 U.S. 621, 632 [23 L.Ed.2d 583, 592]; *Cipriano* v. *City of Houma, supra,* 395 U.S. 701, 706 [23 L.Ed.2d 647, 651].)

Although accorded only the briefest mention by respondents, there is another source of potential state interest in preserving the absolute quality of the English literacy requirement. We refer, not to the state's concern with standards for voter qualification, but to its professed desire to avoid the cost and administrative complexity entailed in providing a bilingual electoral system. Most significant would be the expense of translating, printing and distributing ballots, sample ballots, and ballot pamphlets (which contain texts of proposed measures, an analysis of them prepared by public counsel, and arguments in support and in opposition) in both English and Spanish. In addition, increased difficulties in the counting and reporting of returns reasonably could be anticipated.[32] It is clear, as respondents appear to concede, that the question of constitutionality cannot turn on this issue alone.

---

[32]The difficulties in efficient distribution of both English and Spanish electoral materials may not be as severe as respondents intimate. For instance, prospective voters could be required to inform the registrar at the time they registered whether they would use the English or the Spanish system. Thus the state could anticipate the requisite number of Spanish language ballots that would be needed at specific precincts, and it would know the addresses to which sample ballots and ballot pamphlets should be mailed in each language.

Other states have adopted such bilingual systems. In Hawaii, where literacy in either English or Hawaiian suffices, candidates' names may be printed in both languages. (Hawaii Rev. Laws, § 11-38.) (1963 Supp.) Until last year, New Mexico statutes provided that ballots and instructions were to be printed in both Spanish and English and authorized personal assistance in voting for those literate in neither language. (New Mexico Stat. Ann., §§ 3-2-11, 3-2-41, 3-3-7, 3-3-12, 3-3-13.) In Louisiana, one can vote if he can read either English or his "mother tongue." (La. Rev. Stat., tit. 18, § 31.) And, of course, the problem of assuring intelligent and accurate balloting has been met by those more than 30 states which have no literacy requirement at all. Florida, for example, permits voters not literate in English to request assistance of any person, including but not limited to official voting inspectors, who may enter the polling booth with the voter in order to provide such assistance. (Fla. Stats. Annot. § 101.051.)

Avoidance or recoupment of administrative costs, while a valid state concern cannot justify imposition of an otherwise improper classification, especially when, as here, it touches on "matters close to the core of our constitutional system." (*Carrington* v. *Rash, supra,* 380 U.S. 89, 96 [13 L.Ed.2d 675, 680]. See also *Shapiro* v. *Thompson, supra,* 394 U.S. 618, 633 [22 L.Ed.2d 600, 614]; *Griffin* v. *Illinois* (1956) 351 U.S. 12 [100 L.Ed. 891, 76 S.Ct. 585, 55 A.L.R.2d 1055].)

Whether such a radical reconstruction of our voting procedures is constitutionally compelled, however, is a separate question. It is clear that the goal of efficient and inexpensive administration, while praiseworthy, cannot justify depriving citizens of fundamental rights. But this does not imply that the state must not only provide all qualified citizens with an equivalent opportunity to exercise their right to vote, but must also provide perfect conditions under which such right is exercised. The equal protection clause does not require, for example, that California provide explanatory material (see Elec. Code § 3566) of varying degrees of complexity and sophistication even though the ability to comprehend an analysis of a technical ballot measure may vary widely among voters. Similarly, California is not required to adopt a bilingual electoral apparatus as a result of our decision today that it may no longer exclude Spanish literates from the polls. The state interest in maintaining a single language system is substantial and the provision of ballots, notices, ballot pamphlets, etc., in Spanish is not necessary either to the formation of intelligent opinions on election issues or to the implementation of those opinions through the mechanics of balloting. It reasonably may be assumed that newly enfranchised voters who are literate in Spanish can prepare themselves to vote through advance study of the sample ballots with the assistance of others capable of reading and translating them. In addition, such voters will have access to the translations of ballot provisions and electoral commentary afforded by the Spanish news media.

We hold, therefore, that as applied to petitioners (and to all residents of Los Angeles County who are otherwise qualified to vote and literate in the Spanish language) the English literacy requirement of article II, section 1 of the California Constitution violates their right to the equal protection of the laws. Our holding, of course, will apply to any case in which otherwise qualified prospective voters, literate in a language other than English, are able to make a comparable demonstration of access to sources of political information. ■ In this regard, we emphasize that our holding is *not* confined to residents of Los Angeles County. We do not intend to introduce into our jurisprudence the anomalies of geographically determined degrees of constitutional protection or county-by-county adjudications of eligibility to vote. Voter qualifications have traditionally been

matters of statewide concern and application.[33] There is no indication that, had those who initially drafted and approved the literacy provision contemplated its unenforceability in a major area of the state,[34] they would have desired its continued application elsewhere. Rather, it seems more likely that they would have preferred the uniform enfranchisement of a foreign language minority once it became clear that it was no longer realistic to equate literacy in that language alone with political ignorance. It thus appears that the unconstitutional *application* of article II, section 1 in Los Angeles County (See *Hamer* v. *Town of Ross* (1963) 59 Cal.2d 776, 789 [31 Cal.Rptr. 335, 382 P.2d 375]) enters so entirely into the pattern of the law as it governs those literate in Spanish, that it cannot be severed from its statewide application. (See *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536, 555 [171 P.2d 885]; *People* v. *Lewis* (1939) 13 Cal. 2d 280, 284 [89 P.2d 388]. See also *Mulkey* v. *Reitman, supra,* 64 Cal.2d 529, at pp. 543-544.) Accordingly, we hold that the English literacy requirement of article II, section 1 cannot be applied, consistently with the Fourteenth Amendment, to California citizens, wherever resident, who are literate in Spanish and in all other respects qualified to vote.[35]

We add one final word. We cannot refrain from observing that if a contrary conclusion were compelled it would indeed be ironic that petitioners, who are the heirs of a great and gracious culture, identified with the birth of California and contributing in no small measure to its growth, should be disenfranchised in their ancestral land, despite their capacity to cast an informed vote.

The judgment is reversed and the cause is remanded with directions to amend the findings of fact and conclusions of law and to enter judgment ordering the issuance of a peremptory writ of mandate commanding re-

---

[33]Indeed, we note that a contemplated amendment to article II, section 1 proposes an extension of the franchise to *all* California citizens who are literate in Spanish, on a *statewide* basis. (Assembly Constitutional Amendment No. 7, Resolution ch. 308, Stats. 1969, pp. 3983-3984.)

[34]Los Angeles County is by far the most populous county in the state, with over 35 percent of all Californians residing therein. As of January 1969, the population of Los Angeles County was estimated at 7,140,100. (1969 Cal. Roster of Federal, State, County, and City Officials, p. 115.)

[35]Unless respondents decide to adopt a new method of determining literacy (see, for example, that employed by New York, which is described by McGovney, The American Suffrage Medley (1949) at p. 63 and reprinted in *Katzenbach* v. *Morgan, supra,* 384 U.S. 641 at pp. 663-664 [16 L.Ed.2d 828 at pp. 842-843]) literacy in Spanish is to be determined by the same standard as is currently employed to determine literacy in English. That is, applicants must demonstrate an ability to read the California Constitution either in English or in an accurate Spanish translation. This assumes, of course, that the respondent-registrar-recorder (and his counterpart in other counties) will require an identical level of competence in either language and will employ sections of comparable difficulty in estimating this level of competence.

spondents to determine the qualifications of petitioners to vote in accordance with the views herein expressed.

Tobriner, Acting C. J., McComb, J., Peters, J., Mosk, J., and Burke, J., concurred.