[Civ. No. 5934. Fifth Dist. Oct. 4, 1983.]

HERBERT E. ROBERTS, as Assessor, etc., Plaintiff and Appellant, v. GULF OIL CORPORATION et al., Defendants and Appellants.

774

**COUNSEL**

Ralph B. Jordan, County Counsel, and Bernard C. Barmann, Deputy County Counsel, for Plaintiff and Appellant.

John H. Larsen, County Counsel (Los Angeles), Lawrence B. Launer, Deputy County Counsel, Hill, Farrer & Burrill, Vincent C. Page and Darlene B. Fischer as Amici Curiae on behalf of Plaintiff and Appellant.

Fred E. Laymon, William V. Kastler, Clifford, Jenkins & Brown, J. Craig Jenkins, Bright & Brown, James S. Bright, Gregory C. Brown, John J. Harris, Hanna & Morton and Edward S. Renwick for Defendants and Appellants.

## OPINION

**ANDREEN, J.**—We are called upon to decide to what extent a county tax assessor may compel disclosure of interpretative data from taxpayers.

Pursuant to Revenue and Taxation Code section 468[1] plaintiff Kern County Assessor Herbert E. Roberts (Assessor) secured a subpena duces tecum compelling defendant Gulf Oil Corporation (Gulf), through one of its employees,[2] to appear in court, answer questions concerning certain properties owned by Gulf and to produce records concerning same. Gulf then moved to modify, limit or quash the subpena duces tecum and for protective orders. After a hearing on the motions, the trial court ordered an evidentiary hearing.

### I. EVIDENTIARY HEARING

In 1977 and 1978, Gulf acquired oil and gas properties located in Kern County. By written request the Assessor asked for, but was denied, information relating to the acquisitions. The request was for raw data, such as measurements of oil gravity, and for interpretative data, such as an isopachous map of the net sand on the productive zones, any report or study on fire-flood projects to be carried out on some of the newly acquired properties and studies of other enhanced recovery projects on others.

At the hearing, Gulf conceded that it was required to furnish raw data, but not what it termed interpretative data. Gulf acknowledges that it was obligated to furnish the following information:

"a. Cumulative Oil Production

"b. Depth to Top of Zone [at well]

"c. Oil Gravity

"d. Original Reservoir Pressure [measured]

---

[1]All statutory references are to the Revenue and Taxation Code unless otherwise indicated.

[2]The employee, M. W. Lovelace, is also a party to this action. Since Lovelace makes no separate contentions, we treat the issues as between the Assessor and Gulf.

"e. Current Reservoir Pressure [measured]

"f. Reservoir Temperature [measured]

"g. Oil Viscosity

"h. Permeability to Air [measured]

"i. Porosity [measured]

"j. Saturation (% of oil, gas and water) [measured]

"k. Oil Saturation Before Burn

"l. Oil Saturation After Burn

"m. Oil Characteristics on Distillation

"n. Unit Agreements

"o. Property Acquisition Data (i.e., sales price, terms, sales agreement, parties, description of property and interests acquired)

"p. Description of Lease Equipment and Facilities

"q. Well Status and Method of Operation

"r. Oil and Gas Sales Data

"s. Production Data (by month and year)

"t. Past and Current Costs and Expenses (by category, including all capital expenditures for new construction and drilling)

"u. Well-Location Maps (including elevations and directional surveys)

"v. Well Logs (including dipmeter)

"w. Measured Test Results (including feasibility and pilot tests)"

After the evidentiary hearing, the trial court ordered Gulf to supply the following documents with respect to eight properties it had recently purchased:

"(1) Cross-sections of the subject properties;

"(2) Structural contour map;

"(3) Isopachous maps of net sand on the productive zones;

"(4) Records reflecting estimates of original oil in place;

"(5) Records reflecting cumulative oil production as of January 1, 1978;

"(6) Records reflecting the following reservoir data, whether measured or estimated;

"(a) depth to top of zone,

"(b) oil gravity,

"(c) estimated original reservoir pressure psig,

"(d) current reservoir pressure psig,

"(e) average net sand thickness, ft.,

"(f) reservoir temperature Fahrenheit,

"(g) oil viscosity (at several temps.)—at 100, at 200, at 350,

"(h) average permeabaility [sic] to air, md.,

"(i) average porosity,

"(j) original oil content, bbl./ac. ft.,

"(k) average saturation, %—oil (So), water (Sw), gas (Sg),

"(l) core data—oil saturation before Burn (So), oil saturation after Burn (Sro), and

"(m) oil characteristics of distillation;

"(7) Copies of the unit agreement."

By stipulation before and during the hearing below, Gulf agreed to provide the following additional information: items (5), (6)(a), (6)(b), (6)(f), (6)(g), (6)(l), (6)(m), as *measured* but not as estimated or averaged and (7).

On appeal Gulf contends it is not required to provide to the Assessor the following items: (1), (2), (3), (4), (6)(c), (6)(d), (6)(e), (6)(h), (6)(i), (6)(j), and (6)(k). Gulf also contends it is not required to provide as estimated or averaged the following: (5), (6)(a), (6)(b), (6)(f), (6)(g), (6)(l), and (6)(m).

With respect to all oil and gas properties owned by Gulf and located in Kern County, Gulf was ordered to provide "The pertinent portions of Gulf's proved reserves ledger."[3] Gulf also appeals this order.

Finally, the trial court ruled that Gulf was not required to make available to the Assessor the following documents: "Unit engineering reports, or records containing any report or study on the fire-flood project to be carried out on the Fruitvale NW Unit and relied on in the purchase of leases in 1977 and 1978, and any report or study on any other enhanced recovery project to be carried out on leases purchased in 1977 and 1978 in Kern County and relied on in the purchase of such leases." The Assessor contends that the above information is necessary to determine the estimated reserves and cross-appeals from this portion of the order.

The Assessor established and the court below found that the Assessor must appraise and place a fair market value on approximately 2,700 parcels of oil and gas producing properties, which constitute 42 percent of the secured roll of the county in terms of value. At the time of the hearing, an additional 2,500 wells were being drilled each year in Kern County.

The court issued findings in which it found that oil and gas producing properties are generally appraised by the so-called income method, although the comparative sales approach is sometimes used in combination with it.[4] Application of the income method of valuation requires the determination of: (1) the future recoverable oil and gas by primary and secondary recovery;[5] (2) the future price and cost; and (3) the discount of the net dollars to be received by a capitalization rate which reflects the overall risk of a proj-

---

[3]A reserves ledger reflects those figures used on an everyday basis as the estimate of reserves. The Assessor claims he uses the reserves ledger both for calculation of his own reserves analysis and as verification of the taxpayer's estimated reserves.

[4]The income method or capitalization income method has been expressly approved by the California Supreme Court. (*California Portland Cement Co.* v. *State Bd. of Equalization* (1967) 67 Cal.2d 578 [63 Cal.Rptr. 5, 432 P.2d 700].)

[5]Secondary recovery or enhanced recovery is "any process of artificially supplying energy to a reservoir to implement the recovery of additional oil. Primary recovery, in contrast, is the recovery of oil by utilizing natural reservoir energy." (Assessors' Handbook, AH 566, The Appraisal of Oil and Gas Producing Properties (1972 ed.) p. 29.) Various types of secondary recovery methods include water flood, gas injection, thermal (in situ burning, hot water flood, steam injection, automatic), and miscible phase displacement. Approximately 50 to 60 percent of the oil produced in Kern County is now attributable to secondary recovery operations.

ect and the return on investment. (Ehrman & Flavin, Taxing Cal. Property (2d ed. 1979) p. 473.)

The court further found the accuracy of the income method can be no greater than the validity of the basic assumptions or data on which it is based. Each of the basic steps is complex and involves many technical determinations and estimates. Even a small error in the determination of the net income to be capitalized or the selection of the proper capitalization rate will, through the process of multiplication, be greatly magnified in the value conclusion. Consequently, it is very important that the relevant data be current.

The evidence established that up until 1977 a number of operators provided the Assessor upon request with the data Gulf now contends it does not have to supply. Apparently when the price of oil was stable, the industry cooperated with assessors on a statewide basis, but with the escalation of prices, the oil industry has become more and more reluctant to provide information. Due to the failure of Gulf and other operators to provide allegedly relevant and essential information on their properties purchased in 1977 and 1978, the Assessor prepared a roll for 1978, 1979 and 1980 based on information dating back to 1977, which was outdated and possibly resulted in undervaluation of those properties.

The court also found: "21. The market value of an oil and gas mineral property interest is determined by estimating the value of the volume of proved reserves, which are those reserves which geological and engineering information indicate with reasonable certainty to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions. A change in economic conditions and/or technology may make the recovery of additional reserves feasible and thereby increase the reserves and taxable mineral interest . . . ."

The trial court also found: "25. Reserves may be determined by a volumetric calculation, decline curve estimate, and a materials balance calculation. A decline curve estimate is not appropriate for those properties which do not have an established production history or for those properties on which enhanced recovery is to be commenced or is commencing. The volumetric calculation procedure can be applied to an oil field at any time, but in practice it is used mainly in a field's earliest life or when secondary recovery is planned or is commencing."

The court found that the Assessor does not have the office staff and petroleum engineers/geologists necessary to assess Gulf's properties from what Gulf terms raw data. Such expertise would be difficult to obtain because of

civil service constraints. Further, the Assessor's office does not have an employee or consultant who is an expert or who has experience in secondary recovery technologies and it is unlikely such expertise could be obtained. Experience and expertise in the fire-flood method of recovery is limited to a very few oil producers.

The court below stated: "30. Major oil producers such as Gulf usually do not invest in or undertake secondary enhanced recovery projects, such as the fire-flood project on the Fruitvale NW Unit, without conducting or obtaining an engineering report or feasibility study on the technical and economic aspects of such a project in order to determine the risk of profitability of such a project. Such reports usually include such information as future recoverable oil (reserves), projected price per barrel for such oil, projected operating costs for the project, the technical feasibility and risk of the project, whether it depends on old or new technology, and a discussion of one or more capitalization rates (discount rates) based on the degree of risk of the project, the cost of money and acceptable rates of return."

II. ■■■ The Language of the Revenue and Taxation Code Requires Gulf to Disclose the Information Sought by the Assessor

We turn to an examination of certain sections of the Revenue and Taxation Code pertinent to this appeal. Section 441, subdivision (d), provides: "At any time, as required by the assessor for assessment purposes, every person shall make available for examination information or records regarding his property. In this connection details of property acquisition transactions, construction and development costs, rental income, and other data relevant to the determination of an estimate of value are to be considered as information essential to the proper discharge of the assessor's duties."

Section 442 provides: "The property statement shall show all taxable property owned, claimed, possessed, controlled, or managed by the person filing it and required to be reported thereon.

"Every person owning, claiming, possessing, controlling or managing property shall furnish any required information or records to the assessor for examination at any time."[6]

Finally, section 470 provides: "Upon request of an assessor, a person owning, claiming, possessing or controlling property subject to local assessment shall make available at his principal place of business, principal

---

[6]Sections 441 and 442 were amended after judgment was rendered below; these changes are not relevant to our discussion.

location or principal address in California or at a place mutually agreeable to the assessor and the person, a true copy of business records relevant to the amount, cost and value of all property that he owns, claims, possesses or controls within the county."

Gulf contends that the reasonable interpretation of the pertinent statutes (primarily §§ 441, subd. (d), and 470) compels the conclusion that the Legislature intended to limit the Assessor's authority to request information to only "factual" and not "interpretative" data relevant to an estimate of the fair market value of the taxpayer's property.

Gulf points out that subdivision (d) of section 441 sets forth specific examples of the type of information the section requires a taxpayer to make available: (1) details of property acquisition transactions; (2) construction and development costs; and (3) rental income. Gulf argues that each of these examples is clearly factual, not subjective information. Gulf further argues that the word "data" should be narrowly construed to mean factual information, i.e., measurements or statistics.

We set forth in the margin[7] the statutory history of these sections. It fully supports the testimony of William Keller, a qualified expert analyst of leg-

---

[7]The predecessor statute to sections 441, subdivision (d) and 442 was former Political Code section 3629. It was amended in 1929 to provide that an assessee must furnish the assessor "such information or records for examination as may be required by the assessor to make a proper assessment." (Stats. 1929, ch. 54, § 4, p. 127.) This was the first appearance of this predecessor language. (Compare Stats. 1881, ch. 53, § 5, p. 58; Stats. 1917, ch. 226, § 7, p. 428; Stats. 1925, ch. 12, § 5, p. 14; with Stats. 1929, ch. 54, § 4, p. 127.)

The Legislative Digest for 1929 prepared by the Legislative Counsel states that section 3629 "[p]rovides that assessor may at any time during year examine records of any persons to make a proper assessment." (Leg. Dig. (1929) p. 202.)

The mandate of former Political Code section 3629 for a "proper assessment" was required because decisions of both the United States and California Supreme Courts invalidated the statutory method of assessing intangible property (Minnesota v. First Nat. Bank (1927) 273 U.S. 561 [71 L.Ed. 774, 47 S.Ct. 468]; First Nat. Bank v. Hartford (1927) 273 U.S. 548 [71 L.Ed. 767, 47 S.Ct. 462, 59 A.L.R. 1]; Arnold v. Hopkins (1928) 203 Cal. 553 [265 P. 223]) and resulted in the assessment methods, "some more naive than others," being left to the discretion of the assessor. (Final Rep. of the California Tax Commission (1929) pp. 243, 279-289.)

One species of intangible property that presented particularly difficult assessment problems was that of "solvent credits." (Id., at pp. 279-289.) The terms "solvent credits" and "intangible property" were used interchangeably in the Final Report of the California Tax Commission. (Id., at pp. 280-285.) Although statutorily defined as an unsecured solvent debt (former Pol. Code, § 3617; Stats. 1929, ch. 54, § 1, pp. 125-126) the dictionary definition of "solvent credits" at the time read: "Credits which are worth their face value and which are collectible, not by suit or on execution, but in the ordinary course of business and by usual business methods. In other words, they are what are called 'good' accounts." (Ballentine's Law Dict. (1930) p. 1214, col. 2; see Stillman v. Lynch (1920) 56 Utah 540 [92 P. 272, 277].) Part three of the Final Report of the California Tax Commission, a special

islative intent, that the Legislature intended to broaden the power of the Assessor when it enacted section 441, subdivision (d). Keller testified that

commission established in 1927 to investigate and report on revenue and taxation (Stats. 1927, ch. 455, §§ 1, 2, 3, p. 782), dealt with the problem of "solvent credits" and was submitted to the Legislature prior to the introduction of Senate Bill No. 670, January 18, 1929, Regular Session, which, when chaptered, contained the 1929 amending language to former Political Code section 3629. (Final Rep. of the California Tax Commission, *supra*, p. 244.)

In summary, the 1929 amendment to former Political Code section 3629 demonstrated the Legislature wanted to give assessors broad enough powers to allow them to obtain from assessee's the information they needed to make a proper assessment of intangibles, or solvent credits. When the Legislature gave the assessor power to ask the assessee for information about solvent credits, the only thing the assessor could ask for would be the assessee's opinion, because a solvent credit is a credit which the assessee believes he can collect without having to resort to legal process. As seen, that is the definition of a solvent credit.

The language of former Political Code section 3629 was recodified in the Revenue and Taxation Code and appears in section 442 and the first sentence of section 441, subdivision (d) of that code. (Stats. 1939, ch. 154, p. 1286.) This recodification was done upon the recommendation of the California Code Commission as part of a comprehensive revision "to present in a single statute [*sic*] all of the existing statutory law relating to the subject of state and county taxation without change in legal effect . . . ." (Proposed Revenue and Taxation Code Prepared by the California Code Commission (1938-1939) p. v.)

Section 470 and the second sentence of section 441, subdivision (d) were added as part of the Knox-Petris Property Tax Reform Bill of 1966, the only time section 441, subdivision (d) has been amended since its inception. (Stats. 1966, First Ex. Sess. 1966, ch. 147, §§ 37, 46, pp. 660, 662.) The press release prepared by Assemblymen coauthors Petris and Knox listed the following points, inter alia, about the proposed legislation: "[O]ut-of-state, or out-of-county businesses would be required to keep or make available . . . true copies of all records relevant to property holdings and business activities.

" . . . . . . . . . . . . . . . . . . . .

"[A]ssessors would be given broad authority to demand that assessees furnish them with relevant property tax records and information." (Press Release for Mar. 1, 1966, of Assemblymen Petris and Knox, "Assessment Reform" pp. 1, 2.) The Knox-Petris Property Tax Reform Bill was a legislative response to widespread underevaluation by many county assessors' offices. (See generally, Transcript of Hearing on the Subject of Operation and Administration of County Assessors Offices, Meeting of the Assembly Interim Committee on Municipal and County Governments, Dec. 8 and 9, 1965, pp. 1-127.) The statements made by Assemblyman Knox, the chairman of the Assembly Interim Committee on Municipal and County Governments, indicate the tenor of the legislators' reaction to underassessment and the scope of the power they wished to give to assessors to make an adequate assessment:

"It is appropriate at the conclusion of this series of hearings into the operation and administration of county assessors' offices to summarize briefly for the public record the major facts that our investigations have disclosed and to indicate the type of general legislation that these disclosures demand.

"There is no serious controversy over the facts. They are:

" . . . . . . . . . . . . . . . . . . . .

"2. Only a small fraction of this $200 million loss [due to underassessment] can be attributed to alleged collusion between the assessor and business officials. Most of the loss is attributed to personal property reporting procedures which the Attorney General's fraud specialists indicated functioned as an open invitation to falsification. And which, various property tax consultants testified, permitted them to understate business property holdings with impunity. . . .

"The situation clearly demands a legislative remedy . . . . [O]ur goal will be to insure that the administrative procedures used by local assessors . . . achieve a fundamental equity

the Legislature intended to give the Assessor the power to obtain whatever information he determined was necessary to make a proper assessment. According to Keller, subdivision (d) was enacted "to get to underassessment . . . , to uncover assets which were undervalued or undisclosed entirely." In his study of the legislative history, Keller uncovered no expression of legislative intent prohibiting the Assessor from obtaining what Gulf has characterized as interpretive data.

The plain meaning of the language of the statutes leads to the same conclusion. The language "other data relevant to the determination of an estimate of value" contained in section 441, subdivision (d), and "any required information or records to the assessor" set forth in section 442, and finally, the words "business records relevant to the amount, cost and value of all property" contained in section 470 are broad grants of power to the Assessor to demand information. We find nothing in sections 441, 442 and 470 which supports Gulf's attempt to distinguish between raw and interpretive data.

Gulf argues that the term "business records" in section 470 must mean "business records" as defined in the Evidence Code. The hearsay exception for business records was formulated to insure the trustworthiness of records for litigation purposes. Technical rules of evidence do not apply to the assessment process. There is nothing in the Revenue and Taxation Code indicating a legislative intent to incorporate into it evidentiary rules.

Section 441, subdivision (d), provides that the Assessor may examine "other data relevant to the determination of an estimate of value . . . ." Section 7602(a)(1) of the Internal Revenue Code of 1954 provides that the Treasury Department employees may, for the purpose of, among other things, determining the liability of any person for any internal revenue tax, "examine any books, papers, records, or other data which may be relevant or material to such inquiry." (26 U.S.C. § 7602(a)(1).)[8]

---

in local assessment. In short, we want to provide sufficient checks and balances to close the $200 million loophole and to make certain it won't happen again. . . . Any realistic solution must involve the following steps:

"I. Providing local assessors with better tools for detecting falsification and under-reporting on property statements.

". . . . . . . . . . . . . . . . . . . . . . . .

"We must make clear here and now that the legislative program proposed by this committee will be a stringent one." (*Id.*, at pp. 124, 125, 126.)

[8]Title 26 United States Code section 7602(a)(1) provides: "(a) Authority to Summon, etc.—For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

"(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry."

This language in the Internal Revenue Code has been broadly construed. In *United States* v. *McKay* (5th Cir. 1967) 372 F.2d 174, 176-177, the Fifth Circuit reversed a district court which had denied a petition by the United States to enforce a summons seeking an appraisal report relating to the property of a coal company. In *United States* v. *Davey* (2d Cir. 1976) 543 F.2d 996, 1001, it was held that the Internal Revenue Service may subpena computer tapes in face of the taxpayer's contention that it should only be forced to provide printouts from the tapes. In *United States* v. *Ruggeiro* (9th Cir. 1970) 425 F.2d 1069, 1070-1071, the court held that the words "relevant or material" have a broader connotation in reference to an Internal Revenue Service summons issued pursuant to 26 United States Code section 7602 than they have at trial. Finally, in *United States* v. *Luther* (9th Cir. 1973) 481 F.2d 429, it was held that a corporation could be compelled to permit inspection of its records in connection with an examination of income tax returns of its president. (Accord *United States* v. *Wall Corporation* (D.C. Cir. 1972) 475 F.2d 893, 893-895.)

Because the language contained in section 441, subdivision (d), is at least as broad as that contained in 26 United States Code section 7602(a)(1), the holdings in the federal cases are helpful.[9]

■ The subjective/objective distinction sought by Gulf is singularly inappropriate in the context of the assessment and appraisal of oil and gas interests. Oil and gas, unlike an apartment building or a commercial building, cannot be viewed. The value of such property is constantly changing as a result of economic factors and discovery or refinement of technological processes. Due to the unique quality of oil and gas interests, most, if not all of the data pertaining to the characteristics of the property could be considered interpretive to a certain degree. Even the well logs Gulf concedes it is obligated to furnish are viewed by some as interpretive.

---

[9]Gulf argues that the analogy between the federal income tax system and the state's ad valorem tax system is misplaced, because the federal system is self-reporting and contains greater safeguards. The argument leads nowhere. The need for accurate and complete data exists in both systems. The same policy considerations which mandate the investiture of broad powers to federal tax agents argue for equally broad discretion to county tax assessors. Further, it is not true that the California ad valorem tax system is not dependent on self reporting. The Legislature has deemed the concept so important that it has imposed criminal and civil penalties for failure to provide information. (See §§ 462, 463, 482 and 501-504.)

Gulf attempts to distinguish the federal income tax and state ad valorem systems on the basis of a need for judicial intervention before a taxpayer is compelled to produce information in the federal system. California has ample safeguards, since the examination upon the subpena is before the court. (Compare 26 U.S.C. §§ 7602(a)(2), 7604 with §§ 454, 468.) The observation in *United States* v. *Powell* (1964) 379 U.S. 48, 58 [13 L.Ed.2d 112, 120, 85 S.Ct. 248], is appropriate. "It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused."

Four expert appraisers testified at the hearing, two for each side. Gulf contends all four experts agreed that all the information requested by the Assessor in his subpena could have been developed based solely on the objective factual data Gulf concedes it must provide. Thus, it is argued, it is obvious that the Assessor does not need the additional information sought; the Assessor's request for additional information is merely predicated upon administrative convenience and expediency. According to Gulf, the Assessor has no right to request information which is not necessary for his determination of the appropriate tax.

■ Section 441, subdivision (d), does not use the word necessary, but does use the word "essential." As noted earlier, the statute provides "In this connection details of property acquisition transactions, construction and development costs, rental income, and other data relevant to the determination of an estimate of value are to be considered as information *essential* to the proper discharge of the assessor's duties." (Italics added.)

Apparently, Gulf is arguing that the word "essential" means strict necessity. This interpretation is unreasonable. Given the budget constraints placed on local entities, requiring the assessors of this state to hire additional personnel, which may not be available, to interpret such data would be unreasonable. One must be mindful of the enormity of the task of the Kern County Assessor who must assess 2,700 oil and gas properties, along with numerous other properties.

The term "essential" serves to prohibit harassment by the taxing authority. It is analogous to the requirement in 26 United States Code section 7605(b) which precludes "unnecessary examination or investigations." Section 7605(b) has been construed broadly. For instance, in *United States* v. *Powell, supra,* 379 U.S. 48 [13 L.Ed.2d 112], it was held that the Internal Revenue Service need not establish probable cause to require production of a taxpayer's records. All the Internal Revenue Commissioner need show is "that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed—in particular, that the 'Secretary or his delegate,' after investigation, has determined the further examination to be necessary and has notified the taxpayer in writing to that effect." (At pp. 57-58 [13 L.Ed.2d at p. 119].)

More basically, the word "essential," in the context of section 441, subdivision (d), is used in an expansive, not contractive, sense. The words "are to be considered as information essential to the proper discharge of the assessor's duties," follow language in the statute permitting access to

data relevant to the determination of an estimate of value. The phrase containing the word "essential" is nothing more than a statement that such data is necessary for the proper performance of an assessor's duties.

An assessor who is not otherwise able to obtain needed information would be tempted to overvalue property. This would likely result in an appeal, since it is the Assessor's experience that if his office overvalues an oil and gas producing property, the taxpayer, both informally and by formal appeal, protests the value placed on his property and voluntarily produces those records in his possession which reflect and justify a lower value, which includes the information objected to here.

The provisions governing appeal of an assessment are set forth in sections 1603 through 1613. Section 1603 requires that an assessee, at the time he files his application for reduction of assessment shall set forth his "opinion of the full value of the property" and the "facts claimed to require a reduction." Prior to the hearing, the assessee (and the assessor if the assessed value of the property exceeds $100,000) may initiate discovery procedures pursuant to section 1606.[10] Under this section, after a taxpayer has filed an application for a reduction in assessment, either the taxpayer or the assessor (if the value meets the statutory test) may cause an exchange of certain data,

---

[10]Section 1606 reads in relevant part: "(a) At the time of filing the application or at any time prior to 20 days before the commencement of the hearing on the application, any applicant for a change of an assessment on the local roll or the assessor, in those cases where the assessed value of the property involved, as shown on the current assessment roll, exceeds one hundred thousand dollars ($100,000) without regard to any exemptions, may cause an exchange of information between himself and the other party by submitting the following data to the other party in writing:
"(1) Information stating the basis of such party's opinion of value.
" . . . . . . . . . . . . . . . . . . . . . .
"(3) When the opinion of value is to be supported with evidence based on an income study, information relating to income, expenses and the capitalization method.
" . . . . . . . . . . . . . . . . . . . . . .
"(b) Notwithstanding any limitation on assessed value contained in subdivision (a), if an applicant for a change of an assessment or the assessor has submitted the data required by subdivision (a) within the specified time, at least 10 days prior to the hearing the other party shall submit to the party who caused the exchange of information in writing the following data:
"(1) Information stating the basis of such other party's opinion of value.
" . . . . . . . . . . . . . . . . . . . . . .
"(3) When the opinion of value is to be supported with evidence based on an income study, information relating to income, expenses and the capitalization method.
" . . . . . . . . . . . . . . . . . . . . . .
"Whenever information has been exchanged pursuant to this section the parties may not introduce evidence on matters not so exchanged unless the other party consents to such introduction. However, at the hearing, each party may introduce new material relating to the information received from the other party. If a party introduces new material at the hearing, the other party, upon his request, shall be granted a continuance for a reasonable period of time."

including an income study with information relating to income, expenses, and method of capitalization. There is also a provision precluding a party from introducing evidence on matters not exchanged. (See § 1606, subd. (b).) Gulf argues that since the only penalty for failure to provide the information is preclusion from introducing it in evidence, the Legislature manifested an intent that an assessor may not require a taxpayer to provide such information. The fallacy in the argument is that section 1606 does not purport to define what information must be furnished an assessor upon request. That is done elsewhere in the code. Section 1606 is nothing more than a way of insuring that equalization hearings be fair to both parties through the device of precluding a party from holding back information and then surprising the other with it at the hearing.

It would serve no legitimate interest to hold that the information set forth in section 1606 be provided only in the adversary setting of an appeal.

■ Gulf further argues that the Assessor's proposed interpretation of the Revenue and Taxation Code renders meaningless the protections afforded well owners and operators under the Public Resources Code. Public Resources Code section 3234 expressly provides that production reports and well records are open to inspection to the assessor of the county in which a well is located. However, for purposes of that section, "'well records' shall not include either experimental logs and tests or interpretive data not generally available to all operators." Section 1996.4 of title 14 of the California Administrative Code provides: "'Interpretive data' mean geologic and engineering data, from an owner or operator, that are derived from raw data by means of professional study and interpretation.

"'Interpretive data' include, but are not limited to: geologic cross sections, subsurface contour maps, surface geologic maps, oil and gas reserve calculations, and paleontologic reports." Thus, it is asserted, the Legislature has specifically denied to county assessors, through the Division of Oil and Gas pursuant to Public Resources Code section 3234, a portion of the very information the Assessor seeks in the instant action. However, the purpose of Public Resources Code section 3234 and its companion statutes is to encourage disclosure of information by the oil-producing industry for purposes of conservation of oil and gas and environmental protection. This statutory scheme is in no way determinative of the Assessor's authority to obtain relevant and essential information under the pertinent provisions of the Revenue and Taxation Code because a different and quite separate legislative purpose and concern is addressed in each code. Gulf has presented no legislative history showing that the Legislature considered the impact of Public Resources Code section 3234 on the Revenue and Taxation Code when it enacted that section.

██ We hold that the Revenue and Taxation Code provisions require Gulf to provide the Assessor with all of the information which he has sought in this action.

### III. THE SUPERIOR COURT PROPERLY REJECTED THE CONSTITUTIONAL OBJECTIONS RAISED BY GULF

#### A. GULF'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES WAS NOT VIOLATED

██ Gulf contends that the items requested by the Assessor violated its right under the Fourth Amendment to be free from unreasonable searches and seizures. This claim is meritless.

It is clear to us that the information sought by the Assessor does not violate the Fourth Amendment. The privilege to be free from unreasonable, searches and seizures is not available to shield a taxpayer's papers from scrutiny by government agents engaged in reasonable activities to determine taxes. (See *United States* v. *Theep* (9th Cir. 1974) 502 F.2d 797; *United States* v. *Ahmanson* (9th Cir. 1969) 415 F.2d 785; cf. *Fisher* v. *United States* (1976) 425 U.S. 391, 401, fn. 7 [48 L.Ed.2d 39, 50, 96 S.Ct. 1569].) In *Brovelli* v. *Superior Court* (1961) 56 Cal.2d 524, 529 [15 Cal.Rptr. 630, 364 P.2d 462], our Supreme Court resolved the question at bench as follows: "Insofar as the prohibition against unreasonable searches and seizures can be said to apply at all it requires only that the inquiry be one which the agency demanding production is authorized to make, that the demand be not too indefinite, and that the information sought be reasonably relevant. [Citations.]"[11]

Gulf also relies on the "administrative search" cases, *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727] and *Marshall* v. *Barlow's, Inc.* (1978) 436 U.S. 307 [56 L.Ed.2d 305, 98 S.Ct. 1816], for the proposition that warrantless administrative searches are prohibited. *Camara* and *Marshall* merely held that OSHA and health inspectors are required to obtain a warrant if requested in order to make routine annual inspections. The only showing required to obtain such a warrant is that the

---

[11] *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313], relied upon by Gulf, is inapposite, for it deals with *public* disclosure of private financial records of those seeking public or private office, along with those of their spouses and children, without relation to whether the financial dealings or assets might be expected to give rise to a conflict of interest. The court held the statute was overbroad and had an unnecessary chilling effect on those who would otherwise seek public office.

inspection is pursuant to a legitimate administrative scheme. A much stronger showing was made by the Assessor in the instant case.[12]

We also note that neither *Camara* nor *Marshall* stand for the proposition that a warrant must be obtained under every regulatory statute. *Marshall* expressly held that its requiring a warrant for OSHA inspections did not mean that warrantless search provisions in other regulatory statutes are unconstitutional. "The reasonableness of a warrantless search, however, will depend upon the specific enforcement needs and privacy guarantees of each statute." (*Marshall* v. *Barlow's, Inc., supra,* 436 U.S. at pp. 321-322 [56 L.Ed.2d at pp. 316-317]; cf. *Robert K. Bell Enter.* v. *Consumer Prod. S. Com'n.* (N.D.Okla. 1980) 484 F.Supp. 1221, 1226-1227.) Since the taxpayer, as in the instant case, need not turn over the information requested immediately to the assessor, but may instead invoke judicial review to determine whether the assessor's request is statutorily authorized and not arbitrary, there is no need to require a search warrant.

B. ■ SECTION 441, SUBDIVISION (d) IS NOT VOID FOR VAGUENESS

Gulf argues that section 462, which makes it a misdemeanor to refuse to make available to an assessor the information required by subdivision (d) of section 441, renders the latter section unconstitutional since the taxpayer may not know what information he is required to produce. This argument, however, places the burden of unconstitutionality upon the wrong code section. If the statutory scheme runs afoul of the due process requirement that criminal statutes must be sufficiently certain to inform a person of what acts are punishable, the attack must be on the criminal statute itself. Subdivision (d) of section 441 is not a criminal statute prohibiting conduct. (See generally *United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 176 [154 Cal.Rptr. 263].)[13]

Assuming arguendo that the civil statutes under consideration must be reasonably definite and certain in character, the analysis under part II of this opinion establishes that such particularity exists. By analogy, if Revenue and Taxation Code sections 441, subdivision (d), 442, and 470 are unconstitutional because of vagueness, then the provisions of the Internal Revenue Code of 1954 and 1976, especially section 7602, which provides

---

[12]We are not called upon to discuss the minimum showing that an assessor must make to obtain a subpoena under section 468. The procedure involved in the instant case resulted in a six-day evidentiary hearing concerning the proper scope of the warrant.

[13]In other words, Gulf may only litigate the vagueness of section 462 if the Assessor through the Kern County District Attorney's office attempts to invoke the criminal penalty, a maximum $10,000 fine contained in section 462. Such an action would have to be brought in a criminal proceeding, not in a civil proceeding such as we have before us.

for the examination and inspection of taxpayers' records in broad and general terms, are subject to attack on the same grounds. Also the civil discovery provisions of the California Code of Civil Procedure (§ 2016 et seq.), which are no less vague and broad than the property tax provisions at issue, are unconstitutional on the same ground of vagueness. We have been cited to no case which so holds.

C. ▮▮ GULF DOES NOT HAVE STANDING TO ASSERT THE RIGHT TO PRIVACY UNDER CALIFORNIA CONSTITUTION, ARTICLE I, SECTION 1

We turn to a consideration of the California Constitution, which provides in article I, section 1: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Gulf has not cited a reported case where this right of privacy was invoked against a taxing agency in favor of a corporation.[14]

Article I, section 1, should not be interpreted to preclude an agency such as a county assessor or the Franchise Tax Board from inspecting records of a taxpayer. The privacy interest sought to be protected by the passage of the amendment, which appeared as Proposition 11 on the 1972 General Election ballot, was directed against government (and business) snooping into personal information, the retention of unnecessary information, and the misuse of such information in light of the lack of a reasonable check on its accuracy. (See *White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222].)

The Secretary of State's pamphlet on the constitutional amendment of November 7, 1972, confirms this. It concludes on page 28 with the comment that: "Proposition 11 will not prevent the government from collecting any information it legitimately needs. It will only prevent misuse of this information for unauthorized purposes and preclude the collection of *extraneous or frivolous information.* (Italics added.)

---

[14]Gulf relies on *Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669 [156 Cal.Rptr. 55] for the proposition a corporation has a right to privacy. There, the medical board secured an order commanding a hospital to produce documents relating to five of its patients. Thus, in an investigation of a physician, there was an attempt to review records of third parties—his patients. The only justification for the order was an investigation of a physician's alleged negligence. There was no allegation of complaint by a patient, and no specification of a charge by a fellow physician or member of the public. The appellate panel concluded that article I, section 1, of the California Constitution protected the *patients'* privacy rights in their medical records absent proof of a compelling state interest. Proof of such interest must be established by a "good cause" or "probable cause" showing that the compelling state interest outweighs the citizens' privacy interests. (At pp. 680-681.)

The constitutional provision simply does not apply to corporations. The provision protects the privacy rights of *people*. The election brochure argument, which provides its "legislative history" (*White* v. *Davis, supra,* 13 Cal.3d at p. 775) is set forth in the margin.[15] It is significant that the

[15]"Argument in Favor of Proposition 11

"The proliferation of government snooping and data collecting is threatening to destroy our traditional freedoms. Government agencies seem to be competing to compile the most extensive sets of dossiers of American citizens. Computerization of records makes it possible to create 'cradle-to-grave' profiles on every American.

"*At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.*

"The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.

"*Fundamental to our privacy is the ability to control circulation of personal information.* This is essential to social relationships and personal freedom. The proliferation of government and business records over which we have no control limits our ability to control our personal lives. Often we do not know that these records even exist and we are certainly unable to determine who has access to them.

"Even more dangerous is the loss of control over the accuracy of government and business records on individuals. Obviously, if the person is unaware of the record, he or she cannot review the file and correct inevitable mistakes. Even if the existence of this information is known, few government agencies or private businesses permit individuals to review their files and correct errors.

"The average citizen also does not have control over what information is collected about him. Much is secretly collected. We are required to report some information, regardless of our wishes for privacy or our belief that there is no public need for the information. *Each time we apply for a credit card or a life insurance policy, file a tax return, interview for a job, or get a drivers' license, a dossier is opened and an informational profile is sketched.* Modern technology is capable of monitoring, centralizing and computerizing this information which eliminates any possibility of individual privacy.

"The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution. This right should be abridged only when there is compelling public need. Some information may remain as designated public records but only when the availability of such information is clearly in the public interest.

"Proposition 11 also guarantees that the right of privacy and our other constitutional freedoms extend to all persons by amending Article I and substituting the term 'people' for 'men.' *There should be no ambiguity about whether our constitutional freedoms are for every man, woman and child in this state.*

" . . . . . . . . . . . . . . . . . . . . .
"Rebuttal to Argument in Favor of Proposition 11

"To say that there are at present no effective restraints on the information activities of government and business is simply untrue. In addition to literally hundreds of laws restricting what use can be made of information, every law student knows that the courts have long protected privacy as one of the rights of our citizens.

"Certainly, when we apply for credit cards, life insurance policies, drivers' licenses, file tax returns or give business interviews, it is absolutely essential that we furnish certain personal information. Proposition 11 does not mean that we will no longer have to furnish it and provides no protection as to the use of the information that the Legislature cannot give if it so desires.

argument is couched in terms of protecting real live people—not fictional persons such as corporations. The terms are "American citizens," " 'cradle

"What Proposition 11 can and will do is to make far more difficult what is already difficult enough under present law, investigating and finding out whether persons receiving aid from various government programs are truly needy or merely using welfare to augment their income.

"Proposition 11 can only be an open invitation to welfare fraud and tax evasion and for this reason should be defeated.

" . . . . . . . . . . . . . . . . . . . . .

"Argument Against Proposition 11

"Proposition 11, which adds the word 'privacy' to a list of 'inalienable rights' already enumerated in the Constitution, should be defeated for several reasons.

"To begin with, the present Constitution states that there are certain inalienable rights 'among which are those' that it lists. Thus, our Constitution does not attempt to list *all* of the inalienable rights nor as a practical matter, could it do so. It has always been recognized by the law and the courts that privacy is one of the rights we have, particularly in the enjoyment of home and personal activities. So, in the first place, the amendment is completely unnecessary.

"For many years it has been agreed by scholars and attorneys that it would be advantageous to *remove* much unnecessary wordage from the Constitution, and at present we are spending a great deal of money to finance a Constitution Revision Commission which is working to do this. Its work presently is incomplete and we should not begin to lengthen our Constitution and to amend it piecemeal until at least the Commission has had a chance to finish its work.

"The most important reason why this amendment should be defeated, however, lies in an area where possibly privacy should *not* be completely guaranteed. Most government welfare programs are an attempt by California's more fortunate citizens to assist those who are less fortunate; thus, today, millions of persons are the beneficiaries of government programs, based on the *need* of the recipient, which in turn can only be judged by his revealing his income, assets and general ability to provide for himself.

"If a person on welfare has his privacy protected to the point where he need not reveal his assets and outside income, for example, how could it be determined whether he should be given welfare at all?

"Suppose a person owned a house worth $100,000 and earned $50,000 a year from the operation of a business, but had his privacy protected to the point that he did not have to reveal any of this, and thus qualified for and received welfare payments. Would this be fair either to the taxpayers who pay for welfare or the truly needy who would be deprived of part of their grant because of what the wealthy person was receiving?

"Our government is helping many people who really need and deserve the help. Making privacy an inalienable right could only bring chaos to all government benefit programs, thus depriving all of us, including those who need the help most.

"And so because it is unnecessary, interferes with the work presently being done by the Constitution Revision Commission and would emasculate all government programs based on recipient need, I urge a 'no' vote on Proposition 11.

" . . . . . . . . . . . . . . . . . . . . .

"Rebuttal to Argument Against Proposition 11

"The right to privacy is much more than 'unnecessary wordage.' It is fundamental in any free society. Privacy is not now guaranteed by our State Constitution. This simple amendment will extend various court decisions on privacy to insure protection of our basic rights.

"The work of the Constitution Revision Commission cannot be destroyed by *adding two words* to the State Constitution. The Legislature actually followed the Commission's guidelines in drafting Proposition 11 by keeping the change simple and to the point. Of all the *proposed* constitutional amendments before you, this is the simplest, the most understandable, and one of the most important.

"The right to privacy will not destroy welfare nor undermine any important government program. It is limited by 'compelling public necessity' and the public's need to know.

to grave' profiles." "It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion and our freedom to associate with the people we choose. . . ." There are repeated references to "us", meaning, of course, voters. There is talk regarding *personal* information and "personal lives" and of "individuals." The argument in favor of adopting the proposition concludes that, *"There should be no ambiguity about whether our constitutional freedoms are for every man, woman and child in this state."* (Italics in original.)

Of critical importance is the fact that the word "people" was used in section 1 instead of the word "person." The word "person" has been commonly defined to include a corporation throughout the statutes of California. (See, e.g., Rev. & Tax. Code, § 19.) Nowhere in the statutes of California or elsewhere have we found the word "people" to be defined to include corporations. To the contrary, the only time "people" is defined is in Government Code, title I, division 1, "Sovereignty and People of the State," section 240 which provides: "The people, as a political body, consist of: [¶] (a) Citizens who are electors. [¶] (b) Citizens not electors."

This interpretation is further supported by the fact the election brochure argument speaks in terms of the people versus the government and business interests (i.e., "It prevents government and business interests from collecting and stockpiling unnecessary information about us."). Thus, we conclude that under article I, section 1 of the California Constitution that Gulf as a corporation has no standing to assert a right to privacy under that section.[16]

*Proposition 11 will not prevent the government from collecting any information it legitimately needs. It will only prevent misuse of this information for unauthorized purposes and preclude the collection of extraneous or frivolous information.*
" . . . . . . . . . . . . . . . . "
(Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), arguments in favor of and against Prop. 11, pp. 26-28; final italics added, all other italics original.)

[16]We note that two cases have addressed to some extent the preceding issue. *Ion Equipment Corp.* v. *Nelson* (1980) 110 Cal.App.3d 868, 878 [168 Cal.Rptr. 361], held: "It is generally agreed that the right to privacy is one pertaining only to individuals, and that a corporation cannot claim it as such. (Prosser, Torts, *supra* (4th ed.) § 117, p. 815.) This is because the tort is of a personal character 'concern[ing] one's feelings and one's own peace of mind.' (*City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 268 . . . ; see also, *Fairfield* v. *American Photocopy etc. Co.* (1955) 138 Cal.App.2d 82, 86 . . . .) A corporation is a fictitious person and has no 'feelings' which may be injured in the sense of the tort."
The relevancy of *Ion Equipment Corp.* to the instant case, however, is marginal because there appears to be a distinction between asserting a tort cause of action which requires some form of damages and raising the right of privacy as a shield to governmental intrusion.
*H & M Associates* v. *City of El Centro* (1980) 109 Cal.App.3d 399, 409-412 [167 Cal.Rptr. 392], appears to be in conflict with *Ion Equipment Corp. H & M Associates* held that a partnership may state a cause of action for invasion of privacy and cited article I, section 1. *H & M Associates* appears to be a unique case wherein the City of El Centro cut off water service to an apartment complex owned by a partnership without notice and then notified the mortgagees, the FHA, the local newspaper and several other governmental agencies that water service had been terminated and would not be reinstated. The purpose

## D. Gulf's General Constitutional Right to Privacy Was Not Violated

### 1. Corporations Do Not Have Fundamental Rights of Privacy

■ Gulf alleges unmeritoriously that its rights of privacy are fundamental, so that in the weighing process we should adopt the test of a compelling state interest when balancing the Assessor's needs as against Gulf's rights. The cases it cites for this proposition are inapposite. They relate to sex discrimination (*Frontiero* v. *Richardson* (1973) 411 U.S. 677 [36 L.Ed.2d 583, 93 S.Ct. 1764]); the right to the personal decision to use contraceptives to prevent pregnancy (*Carey* v. *Population Services International* (1977) 431 U.S. 678 [52 L.Ed.2d 675, 97 S.Ct. 2010]); a suspect class based on length of residence for purposes of welfare assistance (*Shapiro* v. *Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322]); a default judgment taken against a prisoner who was unable to appear and defend, a deprivation of property without due process (*Payne* v. *Superior Court* (1976) 17 Cal.3d 908 [132 Cal.Rptr. 405, 553 P.2d 565]); an English literacy test in order to vote (*Castro* v. *State of California* (1970) 2 Cal.3d 223 [85 Cal.Rptr. 20, 466 P.2d 244]); and residence requirements for voting (*Young* v. *Gnoss* (1972) 7 Cal.3d 18 [101 Cal.Rptr. 533, 496 P.2d 445]).

Classifications based upon sex (*Frontiero*), and length of residence (*Shapiro*) are suspect classifications and therefore subjected to close judicial scrutiny. Legislation which disenfranchises citizens (*Castro, Young*), invades the right to personal privacy (*Carey*) or, deprives one of property without due process of law (*Shapiro*) affects rights which are so fundamental as to demand meticulous scrutiny. Gulf's rights are not so fundamental. The interest of a taxpayer to be free from incursions into his or her files is not of the same constitutional significance as the personal right to determine whether to beget a child.

*United States* v. *Morton Salt Co.* (1950) 338 U.S. 632, 652 [94 L.Ed. 401, 416, 70 S.Ct. 357], holds: "[C]orporations can claim no equality with

---

of this action apparently was to allow the city to buy the property at a bargain price at a foreclosure sale. (At p. 404.) *H & M Associates* did not address the issue whether the right to privacy for corporations is a fundamental right that can be asserted as a shield to prevent government access to relevant documents.

We also are not persuaded by Gulf's argument that since the California Right to Financial Privacy Act (Gov. Code, § 7460 et seq.) and the privacy protections under Penal Code section 630 et seq. include corporations, an inference can be drawn that article I, section 1 was intended to invest in corporations a fundamental right to privacy. These laws were enacted by the Legislature and not through the initiative process and thus are not probative.

We recognize that California recognized a right to privacy prior to the 1974 initiative amending article I, section 1 of the California Constitution. (See *Melvin* v. *Reid* (1931) 112 Cal.App. 285 [297 P. 91] wherein an exhibited motion picture revived the past history and disclosed the present identity of a reformed prostitute who, seven years before, had been the defendant in a notorious murder trial.)

individuals in the enjoyment of a right to privacy." There is no need here for the meticulous and careful scrutiny that is accorded more fundamental interests. Accordingly, the "compelling state interest" test is not appropriate.

### 2. CORPORATIONS DO HAVE A GENERAL RIGHT TO PRIVACY

█ Our holding above that Gulf does not have standing to assert a right to privacy under article I, section 1 of the California Constitution and does not have a right to privacy in a fundamental sense, does not mean that Gulf does not retain a general right to privacy under the United States Constitution via some combination of the Fourth Amendment (cf. *G. M. Leasing Corp.* v. *United States* (1977) 429 U.S. 338, 353-354 [50 L.Ed.2d 530, 543-544, 97 S.Ct. 619]; *Silverthorne Lumber Co.* v. *United States* (1920) 251 U.S. 385, 392 [64 L.Ed. 319, 321, 40 S.Ct. 182, 24 A.L.R. 1426]), the Fourteenth Amendment's protection against arbitrary or unjustifiable state deprivations of liberty (cf. *Whalen* v. *Roe* (1977) 429 U.S. 589, 598-600 [51 L.Ed.2d 64, 72-73, 97 S.Ct. 869]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 481-486 [14 L.Ed.2d 510, 512-516, 85 S.Ct. 1678]) and the Fifth Amendment (cf. *Bolling* v. *Sharpe* (1954) 347 U.S. 497, 499-500 [98 L.Ed. 884, 886-887, 74 S.Ct. 693]; *United States* v. *Hubbard* (D.C. Cir. 1980) 650 F.2d 293, 304-307). A corporation may assert a right to privacy as Justice Robert Jackson explained in *United States* v. *Morton Salt Co., supra,* 338 U.S. 632, 651-653 [94 L.Ed. 401, 415-416]: "It is unnecessary here to examine the question of whether a corporation is entitled to the protection of the Fourth Amendment. *Cf. Oklahoma Press Publishing Co.* v. *Walling,* 327 U.S. 186. Although the 'right to be let alone—the most comprehensive of rights and the right most valued by civilized men,' Brandeis, J., dissenting in *Olmstead* v. *United States,* 277 U.S. 438, 471, at 478, is not confined literally to searches and seizures as such, but extends as well to the orderly taking under compulsion of process, *Boyd* v. *United States,* 116 U.S. 616, *Hale* v. *Henkel,* 201 U.S. 43, 70, neither incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret. *Hale* v. *Henkel, supra; United States* v. *White,* 322 U.S. 694.

"While they may and should have protection from unlawful demands made in the name of public investigation, *cf. Federal Trade Comm'n* v. *American Tobacco Co.,* 264 U.S. 298, *corporations can claim no equality with individuals in the enjoyment of a right to privacy. Cf. United States* v. *White, supra.* They are endowed with public attributes. They have a collective impact upon society, from which they derive the privilege of acting as artificial entities. The Federal Government allows them the privilege of engaging in interstate commerce. Favors from government often carry with

them an enhanced measure of regulation. *Cf. Graham* v. *Brotherhood of Locomotive Firemen,* 338 U.S. 232; *Steele* v. *Louisville & Nashville R. Co.,* 323 U.S. 192; *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen,* 323 U.S. 210; *Wickard* v. *Filburn,* 317 U.S. 111, at 129. Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest.

"Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. *Federal Trade Comm'n* v. *American Tobacco Co., supra.* But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant. 'The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.' *Oklahoma Press Publishing Co.* v. *Walling,* 327 U.S. 186, 208. . . ." (Italics added.)[17]

Although corporations have a lesser right to privacy than human beings and are not entitled to claim a right to privacy in terms of a fundamental right, some right to privacy exists. Privacy rights accorded artificial entities are not stagnant, but depend on the circumstances. *United States* v. *Hubbard, supra,* 650 F.2d 293 speaks to this point: "However, we think one cannot draw a bright line at the corporate structure. The public attributes of corporations may indeed reduce *pro tanto* the reasonability of their expectation of privacy, but the nature and purposes of the corporate entity and the nature of the interest sought to be protected will determine the question whether under given facts the corporation *per se* has a protectible privacy interest. Moreover at least certain types of organizations—corporate or noncorporate—should be able to assert in good faith the privacy interests of their members. Finally, whether acting for itself or on behalf of its members, surely the privacy interests of a 'church' [which was at issue in *Hubbard*] must be assessed somewhat differently from the privacy interests of other sorts of 'corporations.' '" (At pp. 306-307, fns. omitted; see also *H & M Associates* v. *City of El Centro, supra,* 109 Cal.App.3d 409-412.)

---

[17]Any claim that *Morton Salt*'s holding that corporations can claim no equality with individuals in the enjoyment of a right to privacy must be reexamined in light of the holding in *First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765 [55 L.Ed.2d 707, 98 S.Ct. 1407] that corporations have similar First Amendment rights to individuals, is foreclosed by the latter case *itself* in footnote 14 at pages 778-779 [55 L.Ed.2d at pp. 718-719]: "Corporate identity has been determinative in several decisions denying corporations certain constitutional rights, such as . . . equality with individuals in the enjoyment of a right to privacy, *California Bankers Assn.* v. *Shultz,* 416 U.S. 21, 65-67 (1974); *United States* v. *Morton Salt Co.,* 338 U.S. 632, 651-652 (1950) . . . ."

It is clear to us that the law is developing in the direction that the strength of the privacy right being asserted by a nonhuman entity depends on the circumstances. Two critical factors are the strength of the nexus between the artificial entity and human beings and the context in which the controversy arises.

Many commentators trace the right to privacy to the famous Harvard Law Review article written in 1890 by Samuel D. Warren and Louis B. Brandeis. (Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193.) We believe Warren and Brandeis would never have envisioned that a major corporation would attempt to invoke the right to privacy to prevent an assessor from obtaining information needed to impose fair taxes. Warren and Brandeis were concerned about private individuals. That the author's concept of the right to privacy related most fundamentally to human beings is illustrated by the following paragraph from their article: "The press is overstepping in every direction the obvious bounds of propriety and of decency. Gossip is no longer the resource of the idle and of the vicious, but has become a trade, which is pursued with industry as well as effrontery. To satisfy a prurient taste the details of sexual relations are spread broadcast in the columns of the daily papers. To occupy the indolent, column upon column is filled with idle gossip, which can only be procured by intrusion upon the domestic circle. The intensity and complexity of life, attendant upon advancing civilization, have rendered necessary some retreat from the world, and man, under the refining influence of culture, has become more sensitive to publicity, so that solitude and privacy have become more essential to the individual; but modern enterprise and invention have, through invasions upon his privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury." (*Id.*, at p. 196.)

In the context of a tax assessor seeking needed information, the nexus between a corporation's right to privacy and an individual's right to be left alone is all but nonexistent. In a complex case such as this it is easy to lose sight of the overall picture. Gulf is a corporation which exists at the pleasure of the state. Part of its social contract includes the requirement that it help support the society which permits its very existence. In the instant case, Gulf is seeking to keep from the Assessor information which would assure that it and corporations like it pay their fair share of taxes. Without denigrating the fact that a corporation does enjoy a right to privacy in some circumstances, the assertion that such a right should exist in the circumstances of the instant case is unreasonable.

IV. CALIFORNIA ASSESSORS HAVE A RIGHT TO REVIEW RECORDS OF TAXPAYERS SUBJECT TO FOUR CONDITIONS

All the Assessor need demonstrate in weighing the taxpayer's interest in the privacy of his records against the Assessor's interest in review-

ing such records is that the demand not be too indefinite, the information sought be reasonably relevant, the action is not taken to seek some collateral advantage and is subject to court review. The test is gleaned from *United States* v. *Bisceglia* (1975) 420 U.S. 141, 146 [43 L.Ed.2d 88, 93, 95 S.Ct. 915]: "We recognize that the authority vested in tax collectors may be abused, as all powers subject to abuse. However, the solution is not to restrict that authority so as to undermine the efficacy of the federal tax system, which seeks to assure that taxpayers pay what Congress has mandated and to prevent dishonest persons from escaping taxation and thus shifting heavier burdens to honest taxpayers. Substantial protection is afforded by the provision that an Internal Revenue Service summons can be enforced only by the courts. [Citations omitted.] Once a summons is challenged it must be scrutinized by a court to determine whether it seeks information relevant to a legitimate investigative purpose and is not meant 'to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.'" (Accord *Brovelli* v. *Superior Court, supra,* 56 Cal.2d 524.)

This test fully supports the trial court's decision in all matters governed by Gulf's appeal. It is consistent with the test enunciated in *United States* v. *Morton Salt Co., supra,* 338 U.S. 632, 652 [94 L.Ed. 401, 415].

Gulf further argues that the subjective thinking, opinions and predictions of its employees are not needed by the Assessor in order to perform his appraisal function. The difficulty with the argument is that Gulf is one of a limited number of producers in a highly technical field. The record establishes that when it purchased oil leases Gulf planned a fire-flood project. It engaged in sophisticated studies and experimentation. The expertise of Gulf's engineers is not available to Assessor—he simply cannot hire such experts. Whether or not the engineers conducted their studies in such a way as to accurately predict the amount of recoverable oil from the fire-flood project, the fact remains that knowledgeable buyers in the market utilize such information when making decisions as to whether to buy or sell. The market—what a willing and knowledgeable seller and purchaser would agree is a fair value for the property—is in part created by the engineering study, which contains the very opinions and subjective evaluations which Gulf claims it should not be compelled to divulge.

The Assessor cannot replicate the study. The number of available engineers with the required knowledge precludes this, even if he could marshal the information, obtain a computer system for modeling the reservoir and spend the extensive time necessary.

The information sought is relevant as one of the factors to be utilized by the Assessor in appraising the subject properties using the income approach.

The assessment of oil and gas reserves, which lie unseen beneath the surface of the earth, is difficult. Following the adoption of Proposition 13, the State Board of Equalization adopted rule 468 (Cal. Admin. Code, tit. 18, § 468) to establish valuation principles for the taxation of such reserves: "(b) . . . Proved reserves are those reserves which geological and engineering information indicate with reasonable certainty to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions. Present and projected economic conditions shall be determined by reference to all economic factors considered by *knowledgeable and informed persons engaged in the operation and buying or selling of such properties, e.g., capitalization rates, product prices and operation expenses.*

"(c) The unique nature of oil and gas property interests requires the application of specialized appraisal techniques . . . . To this end, the valuation of such properties . . . shall be pursuant to the following principles and procedures:

"(1) . . . Base year values shall be determined using factual market data such as prices and expenses ordinarily considered *by knowledgeable and informed persons engaged in the operation, buying and selling of oil, gas and other mineral-producing properties and the production therefrom.* . . .

" . . . . . . . . . . . . . . . . . . . . . .

"(3) Additions to reserves established in a given year by discovery, construction of improvements, or changes in economic conditions shall be quantified and appraised at market value." (Italics added.)

Gulf has not questioned the need of the Assessor to obtain market data from knowledgeable and informed buyers. It allows that it is a knowledgeable and informed buyer. But it seeks to withhold its information. As its position makes clear, it is in its interests to do so. Viewed as an isolated circumstance the result might not be disastrous. However, as established in the court below, Gulf does not walk alone. Other producers are also refusing to reveal their knowledge and information. The result is that assessors are deprived of current market data.

As noted by the trial court, the accuracy of the income method of appraisal is no greater than the validity of the data upon which it is based. Each of the basic steps in the process is complex and involves many technical determinations and estimates, causing the income method to be termed "the most sensitive of the three methods of valuing property." *(Ehrman & Flavin, supra,* at p. 405.) Even a small error in the determination of the net income to be capitalized or the selection of the property capitalization rate will, through the process of multiplication, be greatly magnified in the value conclusion. (Assessor's Handbook, AH 501, General Appraisal Manual (Mar. 1975) at p. 51.) Due to this complexity and sensitivity, the various factors used in the equation may become easily distorted. Consequently, it is necessary to keep market indicia up to date so that market data from comparable sales may be used as a "benchmark" or as a "check" on the data collected from the individual taxpayer.

Moreover, in the case at bar the privacy interest claimed by Gulf may be newly discovered. The record supports a finding that many oil companies in the past provided the disputed information as a matter of course. The fact that after all these years this is a case of first impression supports an inference that oil companies have only recently begun to assert this new privacy interest.

In summation, we conclude Gulf has only a minimal and insubstantial privacy interest in the information sought.[18] To the extent that Gulf has a recognizable privacy interest, it must be weighed against the Assessor's need to obtain information in order to fulfill its constitutional and statutory duty to properly assess property at its full taxable value so that no one escapes a just and equal assessment. (Cal. Const., art. XIII, § 1; art. XIII A; Rev. & Tax. Code, §§ 110, 110.1, 201 and 401.) When so weighed the

---

[18]Gulf has requested this court to take judicial notice of the case of Roberts v. Marathon et al. (Kern County Superior Court No. 166472) wherein the Assessor sought a subpena which requested in part the following: "All documents . . . which analyzes, studies, evaluates and/or projects [*sic*] the effect of any proposed legislation or regulation, on the federal, state or local level, on oil and/or gas production, oil and/or gas prices, oil and/or gas supply and demand the value of oil and gas producing properties, . . . including, but not limited to, any documents from or to any lobbyists, political analysts, legislative analysts, legislators or other persons."

We decline to do so. The Assessor's requests in the instant litigation are limited and there is no need to pass on other issues.

We also decline the Assessor's request that we take judicial notice of the specially entitled proceeding "Petroleum Appraisal Cases [Rule 1550(b)], Judicial Council Coordination Proceedings No. 1192" (Sacramento County Super. Ct. No. 289796; Kern County Super. Ct. No. 168624) because it is not needed in resolving the issues before us.

right of the Assessor to the information which the trial court ordered Gulf to produce is clear.

V. ASSESSOR'S CROSS-APPEAL

 We turn to the Assessor's cross-appeal in reference to the leases purchased by Gulf in 1977 and 1978. The Assessor requested, and the trial court refused, access to the engineering reports which were prepared for and relied on by Gulf's management in the acquisition of those properties based on the corporation's alleged right to privacy. They are termed the fire-flood project and unit engineering report.[19]

In reference to the subject matter covered by the Assessor's cross-appeal, the trial court found: "30. Major oil producers such as Gulf usually do not invest in or undertake secondary enhanced recovery projects, such as the fire-flood project on the Fruitvale NW Unit, without conducting or obtaining an engineering report or feasibility study on the technical and economic aspects of such a project in order to determine the risk of profitability of such a project. Such reports usually include such information as future recoverable oil (reserves), projected price per barrel for such oil, projected operating costs for the project, the technical feasibility and risk of the project, whether it depends on old or new technology, and a discussion of one or more capitalization rates (discount rates) based on the degree of risk of the project, the cost of money and acceptable rates of return.

" . . . . . . . . . . . . . . . . . . . . .

"32. Without access to Gulf's engineering report or study on the fire-flood project to be carried out on the Fruitvale NW Unit and relied on in the purchase by Gulf of property for that purpose, the Assessor will have to conduct such a technical study to produce such a report to make an estimate of the secondary reserves of Gulf's oil and gas producing properties in the unit, to determine the risk and cost of recovery of such reserves and the capital expenditure required for the project." The trial court also concluded that the Assessor could not conduct the technical study referred to in finding 32, for it found that: "28. The Assessor's Office does not have an employee or consultant who is an expert in fire-flood recovery projects.

---

[19]A unit engineering report is a feasibility study on the recoverable oil, risk and profitability of several oil and gas properties to be operated as a unit.

Gulf is known to have developed and possesses considerable expertise and experience in the fire-flood method. Experience and expertise in the fire-flood method of recovery is limited to a very few oil producers.

"29. There are many specialized methods of secondary recovery of oil and gas currently used in Kern County such as the fire-flood method, and the Assessor's Office does not have an employee or consultant who is an expert or who has experience in all such technologies, and it is unlikely that he can obtain such expertise."

In the face of these findings, the court determined that as to the fire-flood project, the Assessor's need did not outweigh Gulf's privacy rights. ■ A trial court has broad discretion in working out appropriate limitations on which records are subject to inspection. (See *Dunn* v. *Ross* (5th Cir. 1966) 356 F.2d 664.) ■ However, in respect to the study of the fire-flood project and unit engineering report, the court's legal conclusion is inconsistent with its findings. The findings demonstrate a need for the information. They more than meet the test of *United States* v. *Bisceglia, supra,* 420 U.S. 141, 146 [43 L.Ed.2d 88, 93]. The legal conclusion was an abuse of discretion.

■ We now turn to the trial court's conclusion that some of the information sought by the Assessor is a trade secret. At issue are feasibility studies and engineering reports. Such are attempts to take raw data and make varying assumptions about what might happen in the future, and then to predict the economic consequences. For any given property, there are usually a number of feasibility studies where an engineer is asked to make varying assumptions about recovery, methodology, price, and cost, and the result is a ream of different answers. These studies typically would include such matters as estimates of future recoverable oil, projected price per barrel for such oil, projected operating costs for the project, the technical feasibility and risk of the project and a discussion of capitalization rates based upon the degree of risk, the cost of money and acceptable rates of return to the company.

Other than a citation to the concurring opinion in *Chanslor-Western Oil & Dev. Co.* v. *Cook* (1980) 101 Cal.App.3d 407, 417 [161 Cal.Rptr. 624], Gulf cites no case analyzing whether such information is a trade secret. Assuming that it is, there is adequate statutory protection for such proprietary information. Section 451 provides that information requested by the Assessor or furnished in a property statement shall be held secret by the Assessor. Section 408, subdivision (a), provides that, except as otherwise provided in subdivisions (b) and (c), any information and records in the Assessor's office which are not required by law to be kept or prepared by

the Assessor, and homeowner's exemption claims, are not public documents and shall not be open to public inspection; subdivision (b) provides that, except as provided in section 408.1, an assessee or his designated representative shall not be provided or permitted to inspect the information and records, other than market data, which also relate to the property or business affairs of another person, unless such disclosure is ordered by a competent court in a proceeding initiated by a taxpayer seeking to challenge the legality of his assessment. Subdivision (b) provides that other than sales information, the Assessor shall not include information on his list of transfers of property interests which relate to the business or business affairs of the owner of the property, information concerning the business carried on upon the subject property, or the income or income stream generated by the property. And finally, section 1605.4 provides that an applicant in an adversary proceeding for reduction of an assessment may request the board to close to the public a portion of the hearing by filing a declaration under penalty of perjury that evidence is to be presented which relates to trade secrets the disclosure of which will be detrimental to the business interests of the owner of the trade secret.

It is apparent that if an assessor were not entitled to the various information which Gulf has denominated "confidential and proprietary" or "trade secret," there would be no need to enact the statutory confidentiality provisions. It is only because the Legislature has recognized an assessor's need for this information to make a proper assessment, that it has been necessary to provide these various protections.

A court has enforced the assessee's rights to keep secret the very information Assessor seeks here. See *Chanslor-Western Oil & Dev. Co.* v. *Cook, supra,* 101 Cal.App.3d 407, wherein the court held that the assessor, in defending his assessment of a competitor's property, could not introduce details of property acquisitions transactions acquired from the assessee, including assumptions as to the amount of oil recoverable, the cost of recovery, the future price of oil, the risk factor, expected net profit, and the acceptable rate of return.[20]

Further protection is provided by section 6254, subdivision (i), of the Government Code, which states that disclosure is not required under the California Public Records Act of "Information required from any taxpayer

---

[20]The information which plaintiff was seeking to protect from disclosure included the following: price paid for the interest acquired, estimated number of barrels of oil to be recoverable in the future, gross future income estimated, assumed crude oil price, maximum escalation of crude oil prices, the period of years for escalation of crude oil prices assumed, the projected net future operation profit, the assumed discount rate and the effect of the royalty interests. (*Id.,* at pp. 410-411.)

in connection with the collection of local taxes which is received in confidence . . . ."

Evidence Code section 1060, the trade secret privilege, must be read in connection with the protections afforded by the Revenue and Taxation and Government Codes. The Revenue and Taxation and Government Codes afford complete protection of trade secret information. It follows that invocation of the trade secret privilege provided in section 1060 of the Evidence Code would, as a matter of law, act to "work injustice" in the words of the section,[21] where, as here, the Assessor has established his need for the information.

Gulf's trade secrets are amply protected by law. The purpose of the trade secret privilege is met by confidentiality in the hands of the Assessor. The law's requirement of a fair valuation of Gulf's properties is met by compelling disclosure.

## VI. CONCLUSION

The judgment is reversed as to the denial of Assessor's access to "[u]nit engineering reports, or records containing any report or study on the fireflood project to be carried out on the Fruitvale NW Unit and relied on in the purchase of leases in 1977 and 1978, and any report or study on any other enhanced recovery project to be carried out on leases purchased in 1977 and 1978 in Kern County and relied on in the purchase of such leases." In all other respects, it is affirmed.

Franson, Acting P. J., and Martin, J., concurred.

A petition for a rehearing was denied November 1, 1983, and the opinion was modified to read as printed above. The petition of defendants and appellants for a hearing by the Supreme Court was denied December 28, 1983.

---

[21]Evidence Code section 1060 provides: "If he or his agent or employee claims the privilege, the owner of a trade secret has a privilege to refuse to disclose the secret, and to prevent another from disclosing it, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice."